**Ronald SUSTER; Patricia Cleary, Plaintiffs–Appellees/Cross–Appellants (96–4115),**

**Beth Smith; Jack Durkin; Robert Lisotto; Stuart Saferin; Christopher A. Boyko; Gail Rose Kane; Timothy P. Maloney, Intervenors–Appellees,**

**v.**

**Jonathan W. MARSHALL; Robin G. Weaver; David T. Evans; Thomas J. Moyer, Chief Justice; Andrew Douglas; Alice Robie Resnick; Francis E. Sweeney; Paul E. Pfeifer; Deborah L. Cook; Evelyn L. Stratton, Defendants–Appellants (96–4048/4287/4380; 97–3174)/Cross–Appellees.**

Nos. 96–4048, 96–4115, 96–4287, 96–4380 and 97–3174.

United States Court of Appeals, Sixth Circuit.

Argued June 11, 1998.

Decided July 30, 1998.

Michael J. Renner (argued and briefed), Office of the Attorney General of Ohio, Columbus, Ohio, for Defendants–Appellants/Cross–Appellees.

Timothy J. Grendell (argued and briefed), Grendell & Targove, Independence, Ohio,

Mark A. Ferguson, Taft, Stettinius & Hollister, Cleveland, Ohio, for Plaintiffs–Appellees/Cross–Appellant in No. 96–4048.

Timothy J. Grendell (argued and briefed), Grendell & Targove, Independence, Ohio, for Plaintiffs–Appellees/Cross–Appellants in Nos. 96–4114, 96–4287, 96–4380, 97–3174.

Steven J. Miller (argued and briefed), John A. Wasleff (briefed), Goodman, Weiss & Miller, Cleveland, Ohio, for Intervenors–Appellees Smith, Durkin and Lisotto.

Sarah J. DeBruin, Warren I. Grody, John F. Birath, Jr. (argued), Bricker & Eckler, for Intervenors–Appellees Saferin, Boyko and Kane.

James S. Gentile, Huberman & Gentile, Youngstown, Ohio, for Intervenor–Appellee Maloney.

Elizabeth M. Osenbaugh (briefed), Department of Justice, Des Moines, Iowa, for Arizona, Amici Curiae.

Eugene P. Whetzel (briefed), Ohio State Bar Association, Columbus, Ohio, for Ohio State Bar Association, Amici Curiae.

Joan M. Englund (briefed), American Civil Liberties Union of Ohio Foundation, Cleveland, Ohio, Scott T. Greenwood (briefed), Greenwood & Associates, Cincinnati, Ohio, for American Civil Liberties Union of Ohio Foundation, Inc., Amici Curiae.

Before: KEITH, SILER, and DAUGHTREY, Circuit Judges.

## OPINION

KEITH, Circuit Judge.

Defendants–Appellants appeal the district court's grant of preliminary injunction, enjoining the enforcement of Canon VII(C)(6) of the Ohio Code of Judicial Conduct. Plaintiffs–Appellees, Suster and Clearly, cross-appeal the district court's denial of preliminary injunction to enjoin enforcement of Canon VII(C)(8) of the Ohio Judicial Code of Conduct. For the reasons set forth below, we AFFIRM the decision of the district court.

1. Canon VII(C)(6) states:
    ... [T]he total amount of expenditures made in the fund raising period allowed by division (C)(4) of this Canon by the campaign commit-

## I. Factual Background

Plaintiffs are judges on the Cuyahoga County Common Pleas Court. Judge Ronald Suster ("Suster") was appointed to the judiciary in October 1995. His judicial term expired on December 31, 1996. From 1981 to 1995, prior to his appointment to the judiciary, Suster served as an elected member of the Ohio House of Representatives from Cuyahoga County. During Suster's tenure as a State Representative, Suster received campaign contributions which were deposited with his campaign committee, "Friends of Ron Suster."

Effective July 1, 1995, the Ohio Supreme Court, pursuant to its powers to regulate the judiciary and bar of the State of Ohio, enacted Judicial Canons VII(C)(6)(d) and VII(C)(8). Judicial Canon VII(C)(6)(d), in its original form, prohibited any candidate in a judicial election from spending more than $75,000.00 in a race for judgeship for the Ohio Common Pleas Court. The provision also prohibited a judicial candidate from spending more than $18,750.00 in the primary election.

In 1996, Suster, while campaigning for re-election, brought suit challenging the constitutionality of the primary campaign spending limit of $18,750.00 ("Suster I"). Prior to a ruling in Suster I, however, the Ohio Supreme Court amended and removed the portion of the Canon which imposed an expenditure limit in primary elections. On February 20, 1996, without a hearing, a Final Consent Decree was entered enjoining Defendants from enforcing the primary election campaign spending limit. Suster, thereafter, spent $72,710.01 to communicate his qualifications and experience to the voters.

Having nearly surpassed the $75,000 spending cap in a judicial election, Suster, along with Judge Patricia Cleary ("Cleary"), filed the instant action seeking declaratory and injunctive relief from the amended Judicial Canon VII(C)(6).[1] They also sought to

tee of a judicial candidate shall not exceed the following:

enjoin and declare unconstitutional Judicial Canon VII(C)(8).[2] Canon VII(C)(8) prohibits anyone from using money raised in a previous non-judicial campaign in a subsequent judicial campaign. Suster challenged this provision because he desired to use the remainder of his state representative campaign contributions toward his efforts for a judgeship.

Conversely, Cleary sought to challenge both Canons arguing that when her term expires in December 2000, she would like to spend more than $75,000 on her re-election campaign. Cleary and Suster both maintain that as registered voters they are entitled to hear as much campaign speech as a candidate wishes to utter.

After a hearing, the district court determined that there was a strong likelihood that Plaintiffs would succeed in establishing on the merits that Canon VII(C)(6) was unconstitutional. The district court determined, however, that Plaintiffs were unlikely to succeed in establishing on the merits that Canon (VII)(C)(8) was unconstitutional. Consequently, the district enjoined Defendants from enforcing Canon VII(C)(6) and refused to enjoin Defendants from enforcing Canon VII(C)(8).

Defendants filed a motion for stay pending appeal stating that the language of the injunction was over-broad. The district court, rather than granting the motion for stay, modified its original order and enjoined enforcement of Canon VII(C)(6) against Plaintiffs only. Defendants filed a timely notice of appeal, and Plaintiffs filed a timely notice of cross-appeal.

On October 10, 1996, Jack Durkin, Beth Smith, and Robert Lisotto filed a motion to intervene as plaintiffs and requested a preliminary injunction. On October 15, 1996,

Stuart Saferin, Christopher Boyko, and Gail Rose Kane also filed a motion to intervene as plaintiffs and requested a preliminary injunction. As there was no opposition to the proposed intervention, the district court granted both motions. The district court also granted the Intervenors' motion for preliminary injunction, to which Defendants filed a timely notice of appeal.

Both set of Intervenors were sitting as judges on the Court of Common Pleas for Cuyahoga County or they were judicial candidates for such position. The Intervenors stated in their petition for injunctive relief that they had the "wherewithal to spend, and intended to spend, sums in excess of the campaign spending cap." (Response Brief for Intervenors at 2.) They argued that if they exceeded the cap, they faced investigations from the Judiciary of Ohio, and possible disciplinary sanctions, fines, cease and desist orders, and an assessment of costs.

Nancy Russo, a judicial opponent of Intervenor Saferin, sought to intervene as a new party defendant and to have the case dismissed. The court denied Russo's motion to dismiss. Thereafter, Russo filed a motion to be dismissed as a defendant. The court granted that motion.

On October 22, 1996, the district court issued an order granting preliminary injunction to all plaintiffs and, upon consent by all the parties, extended the preliminary injunction order to include not only Plaintiffs and Intervenor–Plaintiffs, but also their respective opponents.

On November 1, 1996, Timothy Maloney sought to intervene as an additional plaintiff. He also moved for preliminary injunction. On November 25, 1996, the district court granted Maloney's motion to intervene and

(a) Five hundred thousand dollars in the case of a judicial candidate for chief justice of the Supreme Court;
(b) Three hundred fifty thousand dollars in the case of a judicial candidate for justice of the Supreme Court;
(c) One hundred thousand dollars in the case of a judicial candidate for the court of appeals;
(d) Seventy-five thousand dollars in the case of a judicial candidate for the court of common pleas;

(e) Fifty thousand dollars in the case of a judicial candidate for municipal or county court.

2. Canon VII(C)(8) states:

"[a] judicial candidate shall not expend funds in a judicial campaign that have been contributed to him or her to promote his or her candidacy for a nonjudicial office."

for preliminary injunction. Defendants again filed a timely notice of appeal.

On January 27, 1997, the district court entered a marginal order denying without prejudice Defendants' motion to dismiss Count three of Suster's and Cleary's complaint pending this appeal. Defendants appeal that decision as well.

Amicus Curiae briefs were filed by the American Civil Liberties Union of Ohio, the Ohio State Bar Association, and the National Voting Rights Institute and the Brennan Center for Justice.

## II. Jurisdiction

This Court has jurisdiction over the issuance of a preliminary injunction, pursuant to 28 U.S.C. § 1292(a)(1). Jurisdiction to consider Defendants' appeal of the district court's refusal to dismiss Plaintiffs' substantive due process claim under the Eleventh Amendment, is also appropriate pursuant to the collateral order doctrine and 28 U.S.C. § 1291.

## III. Mootness

■ Although the 1996 election is over, all of the parties assert that this action is not moot as the controversy is "capable of repetition, yet evading review." *See Norman v. Reed*, 502 U.S. 279, 288, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992).

In *Weinstein v. Bradford*, 423 U.S. 147, 148, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), the Supreme Court held that:

> [I]n absence of a class action, the 'capable of repetition, yet evading review' doctrine was limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

The instant action was not filed until August, 1996, three months prior to the general election. Although the parties may have won their respective seats in that election, all have indicated that they intend to seek re-election. Given the short duration between the filing of this action and the general election, there is a "reasonable expectation" that these same litigants, in addition to any other potential candidates in a subsequent election, "would be subjected to the same [constitutional] action again." *Id; see also Renne v. Geary*, 501 U.S. 312, 319–20, 111 S.Ct. 2331, 2338, 115 L.Ed.2d 288 (1991).

The question of whether the district court abused its discretion in granting the preliminary injunction is still ripe. If this Court were to determine that the district court erred in issuing the preliminary injunction, then the legal interests and positions of Plaintiffs and Intervenors would be compromised as they have received no assurances that grievances will not be pursued and penalties not imposed under the old Canon. *See Edgar v. MITE Corp.*, 457 U.S. 624, 647–54, 102 S.Ct. 2629, 2643–47, 73 L.Ed.2d 269 (1982) (Stevens, J., concurring); *McPherson v. Michigan High School Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir.1997) ("The test for mootness 'is whether the relief sought would, if granted, make a difference to the legal interest of the parties.'") (citation omitted). Hence, this Court's review of the district court's grant and denial of preliminary injunction cannot be said to be moot.

As to the substantive challenge to the constitutional merits of Canon VII(C)(6) and Canon VII(C)(8), this Court may no longer consider the former version of Canon VII(C)(6) as it has recently been amended. *Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 414, 92 S.Ct. 574, 575, 30 L.Ed.2d 567 (1972). However, because such expenditure limitations for judicial candidates continue to remain in the revised Canon, albeit they are now population-based, there is still a case and controversy between the parties. The Supreme Court has held that where a new Canon "is sufficiently similar to the [amended Canon] it is permissible to say that the challenged conduct continues," the controversy is not mooted by the change, and a federal court continues to have jurisdiction. *Northeastern Fla. Chapter v. City of Jacksonville*, 508 U.S. 656, 662 n. 3, 113 S.Ct. 2297, 2301 n. 3, 124 L.Ed.2d 586 (1993). Hence, there is jurisdiction over the revised Canon VII(C)(6), as well as Canon VII(C)(8).

With this is mind, Defendants maintain that this Court must "review the judgment of the district court in light of [the] law as it now stands, not as it stood when the judgment was reviewed below." (Reply Brief for Defendants at 1 n.1) (citing *Diffenderfer v. Central Baptist Church*, 404 U.S. 412, 414, 92 S.Ct. 574, 575, 30 L.Ed.2d 567 (1972)).

However, the fact that the Canon has been revised is of no import to this Court's decision to refrain from reviewing the amended Canon because, where a change in law does not extinguish the controversy, the preferred procedure is for the court of appeals to remand the case to the district court for reconsideration of the case under the amended law. *See Concerned Citizens of Vicksburg v. Sills*, 567 F.2d 646, 650 (5th Cir.1978); *Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 (2d Cir.1972).

Hence, as the district court never had the opportunity to fully address the merits of Plaintiffs' challenge prior to the amendment during this appeal, nor has it had the opportunity to fully consider the constitutionality of the amended Canon, this Court will refrain from considering the merits of amended Canon VII(C)(6); limit its review to the consideration of the appropriateness of preliminary injunction under the old Canon VII(C)(6) and under Canon VII(C)(8); and remand amended Canon VII(C)(6) to the district court for a full review.

## IV. Standard of Review

We review a district court's issuance of a preliminary injunction for an abuse of discretion. *In re Eagle–Picher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir.1992). Findings of fact are reviewed for clear error and legal conclusions de novo. *Id.* "A legal or factual error may be sufficient to determine that the district court abused its discretion. However, absent such an error, the district court's weighing and balancing of the equities is overruled 'only in the rarest of cases.'" *Id.* (quoting *NAACP v. City of Mansfield*, 866 F.2d 162, 166 (6th Cir.1989)).

Four factors are considered in determining whether to grant a preliminary injunction: (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable harm; (3) whether an injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of such injunction. *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985).

"It is important to recognize that the four considerations applicable to preliminary injunction are factors to be balanced and not prerequisites that must be satisfied. These factors simply guide the discretion of the court; they are not meant to be rigid and unbending requirements." *In re Eagle–Picher*, 963 F.2d at 859.

## V. Preliminary Injunction— Canon VII(C)(6)

### A. Likelihood of Success on the Merits

Defendants maintain that the district court erred in determining that there was a likelihood of success on the merits. Defendants propose that the district court applied the wrong legal standard for judicial campaigns. Because a judicial officer has the responsibility to fairly and impartially apply the law, Defendants argue that strict scrutiny should not apply. Rather, Defendants suggest that the district court should have balanced the "interests of the individual to comment on matters of public interest and the [alleged] government interest [involved]." (Brief for Defendants at 22.) Consequently, Defendants maintain that the district court erred in its analysis and in its ultimate reliance on *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). This Court rejects Defendants' proposition.[3]

The First Amendment of the United States Constitution states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; **or abridging**

---

**3.** Defendants argue that because *Buckley* involves: (1) federal campaign laws; (2) of a nonjudicial nature; (3) which impose criminal penalties for violations, it was not intended to apply to state judicial elections. These arguments will be dismissed for the same reasons that Court dismisses Defendants' attempt to distinguish judicial elections from all other elections.

**the freedom of speech,** or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I. (Emphasis added.)

█ Infringements upon any individual's exercise of First Amendment rights, especially where they have their most urgent application—in campaigns for electoral offices—requires strict scrutiny review.. *See Fed. Election Comm'n v. Mass. Citizens For Life, Inc.*, 479 U.S. 238, 251–52, 107 S.Ct. 616, 624, 93 L.Ed.2d 539 (1986) (Restrictions so burdening political speech can survive a constitutional attack only if justified by a compelling state interest.); *Kruse v. Cincinnati*, 142 F.3d 907, 912 (6th Cir.1998) (quoting *Buckley*, "expenditure limitations restricting political expression at the core of the electoral process and the First Amendment are subject to exacting scrutiny.").

In *Buckley*, the Supreme Court stated:

[E]xpenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'

*Id.* at 14, 96 S.Ct. 612 (quoting *Roth . v. United States*, 354 U.S. 476, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)). "It is with these principles in mind that we consider the primary contentions of the parties with respect to the [Canon's] limitations upon the ... spending of money in [any] campaign." *Id.*, 96 S.Ct. at 633.

Review of the constitutionality of spending limits in *Buckley* was not based upon the line of reasoning that such limitations should apply only to federal political campaigns. Rather, the constitutionality of such limitations was based upon the reasoning that any expenditure limitation—irrespective of the kind of election involved (state, federal, judicial, non-judicial, · civil penalties, criminal penalties, etc.), "[i]n a republic where the people are sovereign, [and] the ability of the citizenry to make informed choices among candidates for office is essential," must be narrowly tailored and serve a compelling government interest in order to infringe upon a "most fundamental First Amendment activity." *Id.*

This intention is evident from the numerous court decisions that have been rendered since the issuance of *Buckley*. *See Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 657, 110 S.Ct. 1391, 1396, 108 L.Ed.2d 652 (1990) ("To determine whether Michigan's restriction on corporate political expenditures may constitutionally be applied to the Chamber, we must ascertain whether it burdens the exercise of political speech and, if it does, whether it is narrowly tailored to serve a compelling state interest."); *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 1420–21, 55 L.Ed.2d 707 (1978) (Constitutionality of a restriction· by Massachusetts on corporate expenditures depends on surviving exacting scrutiny.); *Shrink Missouri Government PAC, v. Maupin*, 71 F.3d 1422, 1425 (8th Cir.1995) (Missouri's Senate Bill imposing direct and substantial· restraints on. the quantity of speech in state electoral campaign at the core of First Amendment freedoms must be strictly scrutinized.); *Kruse v. Cincinnati*, 142 F.3d at 912 (There is no support for the contention that states have more latitude than the federal government in regulating the First Amendment expression of its citizens; hence, Cincinnati's City. Ordinance placing a , cap on a City Council candidate's campaign expenditures requires strict scrutiny review. Court rejects less rigorous standard proffered by defendants.).

█ Although Defendants cite several cases to support their argument that there is a distinct difference between judicial officers and political officers, this Court finds that an election candidate does not forego his or her First Amendment rights simply because he or she decides to seek a judicial office, rather than a non-judicial one.

Further, to the extent Defendants have attempted to raise the argument that *Buckley* was not intended to apply to state elected

judicial officers because federal judges are appointed, not elected, such an attempt misses the mark.

■ While it is true that the issue in *Buckley* involved federal campaign legislation, that fact simply illustrates that Congress, in enacting the legislation, did not intend for *the legislation* to apply to state elections. There is not the slightest indicia, however, that the Supreme Court, in its ruling, sought only to protect the First Amendment rights of just federal election candidates. To the contrary, the Supreme Court has already determined that states have no greater power to restrain an individual's freedoms protected by the First Amendment than does the Congress of the United States. *Wallace v. Jaffree*, 472 U.S. 38, 48–49, 105 S.Ct. 2479, 2485, 86 L.Ed.2d 29 (1985).

Given the fundamental nature of the right involved, this Court is of the opinion that the language of *Buckley* and its progeny have necessarily determined, irrespective of the *kind* of position sought, that any spending restriction in any *electoral* campaign process is an infringement on a candidate's First Amendment rights, and is subject to "exacting scrutiny." *Buckley*, 424 U.S. at 44–45, 96 S.Ct. 612. The guarantees of the First Amendment are not shaped and reshaped simply because a litigant wishes to distinguish one type of election from another. Neither the First Amendment, nor *Buckley* can be read so narrowly.

Further, this is not merely a time, place and manner restriction as Defendants assert. Defendants attempt to argue that because some courts have upheld content-based restrictions against judicial candidates that would have otherwise been held unconstitutional if applied to non-judicial candidates, it should also be able to regulate the "manner" of how or when judicial candidates may speak. *See, e.g., Stretton v. Disciplinary Bd. of Supreme Ct. of Pennsylvania*, 944 F.2d 137, 144, 146 (3rd Cir.1991) (upholding rules restricting candidates from personally soliciting campaign contributions and banning candidates from advertising their views on legal or political issues); *Haffey v. Taft*, 803 F.Supp. 121, 125–26 (S.D.Ohio 1992) (upholding rule that prohibits judicial candidates

from identifying their party affiliation on the ballot).

However, the Supreme Court has already stated in *Buckley* that such restrictions on campaign expenditures are a restriction on a candidate's "quantity of expression" and not a time, place and manner restriction. *Buckley*, 424 U.S. at 17, 96 S.Ct. 612.

> The critical difference between [spending limits] and those time, place and manner cases is that the present [Canon's] contribution and expenditure limitations impose direct quantity restrictions on political communication and association by persons, groups, candidates and political parties in addition to any reasonable time, place and manner regulation otherwise imposed.

> A restriction on the amount of money a person or group can spend on [judicial] communication during a campaign necessarily reduces the quantity of expression ... and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs.

*Buckley*, 424 U.S. at 18–19, 96 S.Ct. 612 (footnotes omitted).

> This Circuit has also stated,

> [i]t cannot be seriously argued that the prohibition at issue does not restrict the quantity of political speech. Therefore, for the same reason cited by *Buckley*, [campaign expenditure limits] cannot be characterized as a mere time, place and manner restriction.

*Gable v. Patton*, 142 F.3d 940, 953 (6th Cir. 1998).

Further, given the fact that other courts have already allowed such content-based restrictions and limitations to be placed on judicial campaigns in order to limit bias and the appearance of corruption, Defendants are more hard-pressed to justify the additional infringement on the *quantity* of Plaintiffs' exercise of their fundamental First Amendment rights. Hence, Defendants' alleged time, place and manner argument is insufficient and must fail.

In 1992, the Board of Commissioners on Grievances and Discipline of the Ohio Supreme Court created a subcommittee to conduct a comprehensive review of the Ohio Code of Judicial Conduct. ("First Committee.") In 1993, an Ad Hoc Committee was created by the Ohio State Bar Association to review the Ohio Supreme Court's Campaign Finances. ("Ad Hoc Committee.")

On September 13, 1993, the First Committee and the Ad Hoc Committee submitted their reports to the Ohio Supreme Court. Both the First Committee and the Ad Hoc Committee recommended that "population based" campaign spending limits be placed on candidates running for judicial office. Another recommendation from the Ad Hoc Committee also included disqualification for campaign contribution violations.

Several of the First Committee members opposed the placement of spending limitations due to "the potential for proscription of constitutionally protected speech ... and the lack of empirical data that justice is, in fact, for sale by the existence of election results which do not favor the biggest spender." (Joint App. at 260). Conversely, the Ad Hoc Committee "wholeheartedly support[ed] the [proposed] expenditure limitations." (Joint App. at 275).

In September 1993, Chief Justice Moyer of the Ohio Supreme Court submitted the reports of the First Committee and the Ad Hoc Committee to a special committee ("Special Committee"), to conduct a "top-to-bottom review of Ohio's judicial election system." (Joint App. at 247).

The Special Committee, thereafter, authorized a public opinion poll to be conducted by the University of Cincinnati's Institute for Policy Research. In addition to the poll, the Special Committee questioned judges, attorneys, and campaign consultants, and conducted public hearings throughout the state of Ohio. The results of the poll were as follows:

- 58% of the voters thought that candidates were influenced by contributions made to a candidate's election, some of the time; 23% thought candidates were influenced most of the time.

- Of the voters who did not always vote in a judicial election, 58% thought that having more information about candidates would be helpful in encouraging them to vote; 41% thought that more information on endorsements received by candidates would be helpful.

- Over 60% of the voters polled indicated that they wanted more information on a candidate's reputation as an attorney and potential judge; information on a candidate's experience; and information on a candidate's views on legal issues.

- 58% of the voters indicated that the conduct of most judicial candidates makes no difference in the voter's respect for judges in Ohio; 25% indicated that the conduct of judicial candidates diminishes the voter's respect.

- 66% of the voters indicated that commercials and ads about judicial candidates make no difference in the voter's respect for judges in Ohio; 26% indicated that commercials and ads diminish the voter's respect.

- Lastly, when asked "[h]ow useful would the following proposals be in helping to limit the influence of campaign contributions on judicial decisions," 56% of the voters polled indicated that limits on total campaign spending would be helpful; 45% indicated that limits on campaign contributions would be helpful; 45% indicated that increased contribution reporting requirements would be helpful; and 9% indicated that paying for judicial election campaigns with tax money would be helpful.

In January 1995, the Special Committee's report (the "Report") was submitted to the Ohio Supreme Court. The Report indicated that "[n]ine out of ten Ohioans believe judicial decisions are influenced by contributions to political campaigns." Based on this information, as well as other factors, the Report recommended: (1) time limitations for raising and spending campaign funds; (2) prohibitions from "carrying-over" funds from one election year to another; (3) prohibitions from using campaign funds raised as a candidate in another public office; and (4) disqualification for certain campaign contribution

violations. (Joint App. at 35). The Report did not make any recommendations to place expenditure limitations on judges and judicial candidates. The Report stated,

"[a]lthough a cap on spending might seem to be the simplest approach to reducing the large amount of money spent on campaigns, mandatory expenditure limits in non-judicial races have been determined to be unconstitutional. In addition, spending limits can provide an undue advantage to incumbents and candidates with well-known names."

(Report of the Citizens' Committee on Judicial Elections at 7, Joint App. at 308).

After the Report was submitted to the Ohio Supreme Court, and after various submissions of letters, proposals and schools of thought by judges, bar associations, professors, interest groups, and citizens, etc., in March 1995, the Ohio Supreme Court requested the Special Committee to reconvene on the subject of spending limitations in judicial campaigns. After reconvening and conducting a full review of the proposals submitted, the Special Committee again reiterated that "[t]he members did not embrace spending limits" because the "[p]roponents of spending limits could not articulate a compelling state interest to the Committee's satisfaction," in light of *Buckley v. Valeo.* The Special Committee also stated that "[b]y their very nature, spending limits in judicial campaigns make it difficult for challengers to mount an effective campaign against an entrenched incumbent, an opponent with a popular or well known surname or the so-called 'bad apple' judge." (Joint App. at 538–39).

Notwithstanding this reiteration by the Special Committee, the Ohio Supreme Court revised Canon VII and enacted such spending limitations, effective July 1995.

The Supreme Court has determined that the only interest compelling enough to infringe upon the First Amendment rights of a candidate seeking an electoral office is the prevention of corruption or the appearance of corruption. *Federal Election Comm'n v. National Conservative Political Action Comm.,* 470 U.S. 480, 496–97, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). Although Defendants cite several other interests, the prevention of corruption is the only interest the Supreme Court has and, hence, this Court will give credence.

In reviewing Defendants' compelling state interest of alleviating corruption and the appearance of corruption, the district court determined, in accordance with *Buckley,* that a spending cap on the amount that a candidate may spend has little nexus to the state interest of preventing corruption. The district court reasoned that, unlike a campaign contributor, a candidate's own money is not traded for possible political favors. (Joint App. at 107).

Defendants rely heavily on the poll which indicated that 56% of the voters believed that a proposal limiting the total amount a candidate may spend would be helpful to limit the influence of campaign contributions on judicial decisions. Yet, Defendants have proffered no evidence to show a correlation between such campaign expenditures and any corruption. In fact, all of the evidence presented by Defendants appears to suggest that the problem of corruption has resulted from problems with campaign contributions, not expenditures.

Moreover, inasmuch as poll results indicate that voters want more information, not less, unlimited campaign expenditures may, in fact, promote and establish an electorate that is informed and well-aware. This may also help minimize some forms of corruption.

Although Defendants make reference that such expenditure limits will help ensure the independence of the judiciary and ensure that a candidate is "beholden to no one," it is not clear to the Court how Defendants can link a spending limitation on a candidate's own money to such an assurance. In the view of this Court, the very fact that the candidate is allowed to spend his or her own money without any restriction is, in fact, the assurance that the candidate is "beholden to no one."

Accordingly, "we are hard-pressed to discern how the interests of good government could possibly be served by campaign expenditure laws that necessarily have the effect of limiting the quantity of political speech in which candidates for public office are allowed

to engage." *Shrink Missouri Government Political Action Comm. v. Maupin,* 71 F.3d 1422, 1426 (8th Cir.1995), *cert. denied,* 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996).

Nevertheless, even with the compelling state interest of preventing corruption, Defendants have failed to demonstrate that such expenditure limitations are narrowly tailored. Assuming that unlimited campaign expenditures are tied to corruption and some form of *quid pro quo,* a least restrictive means of redressing that problem, as stated by the district court, would be restricting campaign contributions, and/or mandating disqualification if violated. Simply put, there are other avenues available to Defendants to prevent corruption or the appearance of corruption, but, a limitation on campaign expenditures is not one of them.

The district court did not abuse its discretion in finding that Plaintiffs have demonstrated a likelihood of success on the merits.

### B. *Irreparable Harm*

With respect to Defendants' claim that the district court abused its discretion by determining that Plaintiffs would suffer irreparable harm, Defendants' position is again unavailing.

Defendants argue that there would be no irreparable harm because: (1) Cleary was not a candidate in the 1996 election, she merely wanted to hear speech from the candidates; (2) Suster's opponent dropped out of the race and Suster ultimately ran unopposed; and (3) Intervenor Maloney's injunction was not granted until after the election, so he could not have suffered any harm.

As the district court determined, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (Joint App. at 114) (quoting *Elrod v. Burns,* 427 U.S. 347, 372, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989) ("even minimal infringement upon First Amendment constitutes irreparable injury sufficient to justify injunctive relief.")).

First, Cleary as a voter has a First Amendment right to receive information.

*See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 756, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Second, Suster's opponent's status prior to the actual election is irrelevant to the harm Suster would have suffered from being prohibited from communicating with potential voters. His right to speak under the First Amendment is not conditioned upon there being an opposing candidate. Finally, any penalties that would be imposed upon Maloney for violating Canon VII(C)(6), and for exercising his First Amendment rights, would indeed be irreparable. Thus, the district did not abuse its discretion.

### C. *Harm to Others*

Defendants argue that the opponents of the candidates were harmed because they were "suddenly faced with an election in which 'the sky was the limit' for campaign spending." Defendants suggest that the opponents may not have entered the campaign if they knew their opponents would have been able to spend beyond the spending cap. This argument lacks merit.

All judicial candidates affected by the district court's injunction were affected equally. No opponent other than Russo (who ultimately withdrew her claim), sought to intervene and support the spending limitation. Moreover, the fact that a candidate could go over the spending limit would not cause an opponent to suffer any harm. The opponent, if he or she saw fit, could also exceed the spending cap enjoined by the district court. Thus, this argument must fail.

### D. *Public Interest*

Likewise, the district court did not abuse its discretion in finding that "there is no public interest in enforcing a law that 'curtail[s] debate and discussion' regarding issues of political import." *Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, Cal.,* 454 U.S. 290, 299, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981).

Preliminary Injunction enjoining the enforcement of Canon VII(C)(6) was appropriate. The district Court did not abuse its discretion.

## VI. Preliminary Injunction— Canon VII(C)(8)

### A. *Likelihood of Success on the Merits*

■ On cross-appeal, Plaintiffs argue that the district court erred in denying preliminary injunction enjoining the enforcement of Canon VII(C)(8), which prohibits a candidate from using funds received in a non-judicial campaign in a subsequent judicial campaign.

The district court determined that because Canon VII(C)(8), like Canon VII(C)(6), infringes upon Plaintiffs' First Amendment rights, then such infringement must be narrowly tailored to serve an overriding state interest.

It cannot be disputed that the compelling need to avoid corruption and the appearance of corruption could only be served by enforcement of Canon VII(C)(8). Although other non-judicial candidates are permitted to use funds raised in one campaign in a subsequent campaign, *see Service Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1315 (9th Cir.1992), *cert. denied*, 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992), because of the need to avoid corruption or the appearance of corruption in the judiciary, Canon VII(C)(8), along with several other Canons (which Plaintiffs' have not challenged as unconstitutional) were enacted. Together the Canons prohibit candidates from personally soliciting campaign funds; limit the amount of funds an individual may contribute to a candidate's campaign; and prohibit a candidate from promising how she will rule on certain matters.

Yet, in order to give full force and effect to the other Canons, judicial candidates must also comply with Canon VII(C)(8). By complying with Canon VII(C)(8), judicial candidates are prevented from using funds which may potentially be "ideas-bought" funds, or funds which came attached to a candidate's agreement to advance or take on some political issue or cause. Thus, because it is very possible that the funds Suster (or any other candidate) received during his non-judicial campaign may have resulted from the advancement of a position or the endorsement of some political ideology, the state's interest

to ward against such corruption or such perceived corruption is indeed compelling.

Further, Canon VII(C)(8) is narrowly tailored. In all of the cases that have allowed such transfers of funds from one campaign to another, none have involved judicial elections. *See Service Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1315 (9th Cir.1992), *cert. denied*, 505 U.S. 1230, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992); *Shrink Missouri Gov't Political Action Comm. v. Maupin*, 71 F.3d 1422, 1427–28 (8th Cir.1995), *cert. denied*, 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996). Here, the restriction applies only to the use of funds from a non-judicial campaign in a subsequent judicial campaign. Suster is not prohibited from using the funds in another non-judicial campaign, nor is he prohibited from using his judicial campaign funds in a subsequent judicial campaign or a subsequent legislative campaign.

Consequently, the district court did not abuse its discretion in determining that Plaintiffs were not likely to succeed on the merits of this claim.

### B. *Remaining Factors*

Although the loss of First Amendment freedoms results in irreparable injury, as the district court duly noted, the injury caused to Suster "is no more than is necessary to further compelling state interests." (Joint App. at 122).

Further, there is substantial harm that would come to others if the injunction were granted. Irrespective of Suster's opponent's status in the race, other judicial candidates would be harmed and at a severe disadvantage if Suster were allowed to use money obtained by means not allowed in judicial campaigns.

Finally, the public interest certainly favors the enforcement of Canon VII(C)(8). As the district court stated, "[t]he state's interest in ensuring that judges be and appear to be neither antagonistic nor beholden to any interest, party, or person is entitled to the greatest respect." (Joint App. at 122–23) (citing *Morial v. Judiciary Comm'n of State of Louisiana*, 565 F.2d 295, 302 (5th Cir.

1977) (en banc), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1887, 56 L.Ed.2d 395 (1978)).

·The district court did not abuse its discretion in refusing to enjoin the enforcement of Canon VII(C)(8).

### VII. State Substantive Due Process Claim

Defendants contend that the district court erred in denying their motion to dismiss Count three, a pendent state law substantive due process claim that the Ohio Supreme Court acted outside its authority under the Ohio Constitution.

Defendants maintain that they were entitled to Eleventh Amendment immunity against this claim. Conversely, Plaintiffs argue that because the Ohio Constitution provides that the regulation of elections are governed by the legislative branch of government, then the Ohio Supreme Court acted outside its authority, hence *ultra vires.*

As the district court denied Defendants' motion to dismiss without prejudice pending this appeal, this Court, therefore, remands Defendants' motion to dismiss Count three back to the district court for full consideration of the merits.

### VIII. Conclusion

Accordingly, the judgment of Judge Solomon Oliver, Jr. is **AFFIRMED**. This action is **REMANDED** for consideration of Canon VII(C)(6) as amended, with leave for Plaintiffs to amend their complaint if they so desire; and **REMANDED** for the district court's consideration of Defendants' motion to dismiss Count three.