RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0070P (6th Cir.)
File Name: 03a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

No. 99-5683

MARIO ROSALES-GARCIA,
         *Petitioner-Appellant,*


v.


J.T. HOLLAND, Warden,
         *Respondent-Appellee.*

No. 99-5698

REYNERO ARTEAGA
CARBALLO,
         *Petitioner-Appellant,*


v.


MARK LUTTRELL, Warden;
IMMIGRATION AND
NATURALIZATION SERVICE,
         *Respondents-Appellees.*

Nos. 99-5683/5698

Appeal from the United States District Courts
for the Eastern District of Kentucky at Lexington and the
Western District of Tennessee at Memphis.

1

Nos. 98-00286; 98-03081—Karl S. Forester, Chief District Judge and Julia S. Gibbons, District Judge.

Argued:  March 20, 2002

Decided and Filed:  March 5, 2003

Before:  MARTIN, Chief Circuit Judge; KRUPANSKY, BOGGS, BATCHELDER, DAUGHTREY, MOORE, COLE, CLAY, and GILMAN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:**  Judy Rabinovitz, ACLU IMMIGRATION RIGHTS PROJECT, New York, New York, for Appellants. Linda S. Wernery, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Appellees. **ON BRIEF:**  Judy Rabinovitz, ACLU IMMIGRATION RIGHTS PROJECT, New York, New York, Liliana Garces, AMERICAN CIVIL LIBERTIES UNION IMMIGRANTS' RIGHTS PROJECT, Oakland, California, Lucas Guttentag, AMERICAN CIVIL LIBERTIES UNION IMMIGRANTS' RIGHTS PROJECT, New York, New York, David W. Leopold, Cleveland, Ohio, for Appellants. Linda S. Wernery, Greg D. Mack, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, OFFICE OF IMMIGRATION LITIGATION, Washington, D.C., for Appellees.

  MOORE, J., delivered the opinion of the court, in which MARTIN, C. J., DAUGHTREY, COLE, CLAY, and GILMAN, JJ., joined. BOGGS, J. (pp. 48-57), delivered a separate dissenting opinion, in which KRUPANSKY and BATCHELDER, JJ., joined.

----

**OPINION**

----

KAREN NELSON MOORE, Circuit Judge.  Petitioners Mario Rosales-Garcia and Reynero Arteaga Carballo appeal the denials of their petitions for the writ of habeas corpus in the district courts.  Both Petitioners, Cuban nationals who have been ordered removed from the United States, are currently in the indefinite and potentially permanent custody of the Immigration and Naturalization Service ("INS") because Cuba refuses to allow them to return.  In its recent decision in *Zadvydas v. Davis*, 533 U.S. 678, 682 (2001), the Supreme Court held that the provision of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") that authorizes the post-removal-period detention of removed aliens must be construed to contain an "implicit 'reasonable time' limitation" because the indefinite detention of aliens who are removable on grounds of deportability "would raise serious constitutional concerns."

We first conclude that Rosales's and Carballo's detention by the INS is governed by IIRIRA.  We then conclude that although Rosales and Carballo are removable on grounds of inadmissibility, as opposed to deportability, the Supreme Court's limiting construction of IIRIRA's post-removal-detention provision applies to their detention.  Finally, we conclude that even if the Supreme Court's construction of IIRIRA does not apply to Rosales and Carballo, their indefinite detention independently raises constitutional concerns, and we construe IIRIRA's post-removal-period detention provision as it applies to Rosales and Carballo to contain an implicit reasonable-time limitation. Because there is no significant likelihood of the petitioners' removal in the reasonably foreseeable future, the continued detention of the petitioners by the INS is not authorized by the applicable statute, and we **REVERSE** the district courts' denials of their

habeas petitions and **REMAND** for proceedings consistent with this opinion.

## I. BACKGROUND

Petitioners-Appellants Mario Rosales-Garcia ("Rosales") and Reynero Arteaga Carballo ("Carballo") arrived in this country as part of the Mariel boatlift in 1980, during which over 120,000 Cubans crossed by boat from the Mariel harbor in Cuba to the United States. Rosales and Carballo, like most of the Mariel Cubans, arrived in this country without documentation permitting them legal entry; therefore, because they were not authorized to enter the country and because immigration officials stopped them at the border, they were deemed "excludable" under the immigration law in effect at the time.[1]  Although excludable aliens have not "entered" the

procedural fairness be applied under the Due Process Clause, a requirement that has been amply fulfilled.

---

[1]The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") substantially altered the landscape in immigration law. "Among the changes brought by the IIRIRA was a shift in basic immigration terminology." *Chi Thon Ngo v. INS*, 192 F.3d 390, 395 n.4 (3d Cir. 1999).  Pre-IIRIRA, the law referred to "excludable" aliens, "those who were ineligible for admission or entry into the United States." *Id.*; *see also* 8 U.S.C. § 1182(a) (1994).  "Excludable" aliens could be subject to exclusion proceedings; "'[d]eportation' proceedings, in contrast, were brought against those aliens who had gained admission into the country." *Chi Thon Ngo*, 192 F.3d at 395 n.4; *see also* 8 U.S.C. §§ 1251(a), 1252 (1994). "The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission." *Landon v. Plasencia*, 459 U.S. 21, 25 (1982).

IIRIRA "refers to 'inadmissible' aliens[, 8 U.S.C. § 1182(a) (2000),] in the place of 'excludable' aliens.  Although there are still separate grounds of 'inadmissibility' and 'deportability,' the distinction now turns on whether an alien has been 'admitted' to the United States, rather than on whether the alien has gained 'entry.'" *Chi Thon Ngo*, 193 F.3d at 395 n.4.  An alien who does not enter the United States legally is not "admitted."  8 U.S.C. § 1101(a)(13) (2000).  "Inadmissible" aliens, therefore, include aliens who have not entered the United States (formerly excludable) and those who entered illegally (formerly deportable). 8 U.S.C. § 1182(a)(6) (2000).  Both "inadmissible" and "deportable"

statute with respect to one class of persons, to avoid constitutional doubts, and we are then required to read the statute in the same way in cases where there are no constitutional doubts. This does not follow.

I freely grant that there is some anomaly in having the same words mean different things when applied to different groups of people. However, that is a natural consequence of an aggressive application of the constitutional-doubt standard, implemented by a conceded rewriting of the statute, rather than by choosing between plausible alternatives. And, while certainly not conclusive, the fact that the Supreme Court chose to vacate our previous decision in *Rosales-Garcia*, which followed the same logic as the court displays today, is some indication that that result is not lambently clear to the Supreme Court. *Thoms v. Rosales-Garcia*, 534 U.S. 1063 (mem.), *vacating and remanding Rosales-Garcia v. Holland*, 238 F.3d 704 (6th Cir. 2001).

Interestingly, Justice Kennedy noted this dilemma in his dissenting opinion. He did characterize both alternatives as unsustainable, but the nature of the situation requires us to accept one or the other. *Zadvydas*, 533 U.S. at 710-11 (Kennedy, J., dissenting). Under these circumstances, I believe it does far less violence to the language of the statute, to congressional intent, and to a proper understanding of the canon of constitutional avoidance to confront the words of the statute and interpret them according to their tenor, in a case where any "constitutional doubt" is far less than in *Zadvydas*, assuming that there is any doubt whatsoever.

In short, today's decision, perhaps out of a misplaced concern for the individuals before us, grossly distorts the meaning of a statute, and greatly diminishes the range of policy choices available to the political branches in a field uniquely committed to their discretion. Whether indefinite detention of persons as incorrigible as Rosales and Carballo is good policy is not for us to decide. It is a matter for Congress, subject at most to a requirement that some

country for the purposes of immigration law, Rosales and Carballo were permitted physical entry into the United States pursuant to the Attorney General's authority under 8 U.S.C. § 1182(d)(5)(A) (1982) to grant immigration parole.[2]  As of 1986, this parole has been governed by regulations specifically promulgated by the INS for Mariel Cubans. 8 C.F.R. § 212.12 (2002) (the "Cuban Review Plan").

Following their independent criminal convictions, the Attorney General, acting through the INS, revoked Rosales's and Carballo's parole and initiated exclusion proceedings against them. Both petitioners were excluded and, pursuant to the immigration law in effect at the time, they should have been immediately deported. Cuba, however, has refused to repatriate most of the Mariel Cubans whom the United States has excluded, and the U.S. government does not contend in this appeal that a repatriation by Cuba of either Rosales or Carballo is reasonably foreseeable.[3]  Because Cuba refused to

---

aliens are now subject to removal proceedings. 8 U.S.C. § 1229a (2000).

[2] 8 U.S.C. §§ 1182(d) (1994) stipulates that "such parole of such alien shall not be regarded as an admission of the alien." *See also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 175 (1993). This paradox of paroling aliens into the United States yet refusing to recognize their "entry" into the United States has been termed the "entry fiction" by some courts. *See, e.g., Gisbert v. Attorney General*, 988 F.2d 1437, 1440 (5th Cir. 1993).

[3] According to the affidavit of James J. Carragher, the current Coordinator of the Office of Cuban Affairs in the State Department, Cuba agreed to repatriate 2,746 of the excluded Mariel Cubans in 1984. Rosales Supplemental Joint Appendix ("Rosales Supp. J.A.") at 1. As of January 2002, 1,589 of these individuals have been returned to Cuba. However, neither Rosales nor Carballo was on the list of excluded aliens in 1984 — both were excluded after that date. Although Carragher attested that negotiation between the United States and Cuba regarding the excluded Mariel Cubans is ongoing, there is no evidence that Cuba has any particular intention to repatriate Rosales or Carballo.

accept the deportation of either Rosales or Carballo, the INS has detained them in prisons in the United States.

## A. Rosales

Rosales was twenty-three when he arrived in the United States, and he was soon thereafter paroled into the custody of his aunt. Beginning in 1980, Rosales was arrested for a number of offenses, including aggravated battery, possession of marijuana, burglary, and loitering. Rosales was convicted of the following offenses: possession of marijuana and resisting arrest in October 1981; grand theft in September 1981, for which he received two years of probation in March 1983; burglary and grand larceny in October 1983, for which he received two six-month sentences, to be served consecutively; escape from a penal institution in February 1984, for which he received a 366-day sentence; and one count of conspiracy to possess with the intent to distribute cocaine in March 1993, for which he received a sixty-three month federal prison sentence and five years of supervised release.

On July 10, 1986, Rosales's immigration parole was revoked by the INS on the basis of the escape and grand larceny convictions, pursuant to INS authority under 8 U.S.C. § 1182(d)(5)(A) (1982) and 8 C.F.R. § 212.5(d)(2) (1986). In a separate proceeding before an immigration judge, Rosales was denied asylum and ordered excluded on June 26, 1987, pursuant to 8 U.S.C. § 1182(a)(20) (1982), for improper documentation. Rosales was in INS detention between July 1986 and May 1988, when he was again released on parole. After he pleaded guilty to the cocaine conspiracy charge in 1993, the INS revoked Rosales's parole, this time pursuant to the Cuban Review Plan. When Rosales was released from federal prison in May 1997, the INS detained him, pursuant to 8 U.S.C. § 1226(e) (1994). Rosales remained in INS detention for four years, during which time he was denied parole twice, in November 1997 and March 1999, under the Cuban Review Plan. In April 2001, Rosales was granted

Indeed, its merits aside, the canon of constitutional avoidance has historically contemplated precisely such a result. From the beginnings of statutory construction in federal courts, the Supreme Court has held that "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *See NLRB v. Catholic Bishop*, 440 U.S. 490, 500 (1979) (discussing the opinion of Chief Justice Marshall in *Murray v. The Charming Betsy*, 6 U.S. (2 Cranch) 64 (1804)). The canon of constitutional avoidance is a majoritarian default rule. That is, the canon draws its legitimacy from the premise that Congress generally does not intend for its statutes to exceed constitutional limits. But this supposition cannot be significantly expanded without straining the justification beyond reason. Congress often intends to legislate *to*, even if not *beyond*, the limitations of the Constitution. If the canon of constitutional avoidance is to be justifiable, it must at least permit Congress to legislate to the limits of what is constitutionally permissible.

There is no textual source for the Supreme Court's application of a specific time limitation to the Attorney General's discretion to detain aliens under IIRIRA. Instead, the word "may" on which the Supreme Court focused in *Zadvydas*, if the canon of constitutional avoidance is to have any meaning, permits the Attorney General to detain beyond the removal period, but only as allowed by the Constitution. And the Supreme Court is clear that the Constitution does not grant "excludable" aliens a right to release into the United States after a "reasonable time." Thus, that "deportable" aliens may only be detained for a "reasonable time" after the removal period but "excludable" aliens may be detained indefinitely is not only a consistent, but the required, reading of § 1231(a)(6) in the context of the canon of constitutional avoidance.

In contrast, our court's holding that extends the "reasonable time" limitation to excludable aliens is a classic example of the tail wagging the dog. The Supreme Court rewrites a

enforceable." 8 U.S.C. § 1231(h). The intent of Congress is clear that it had intended, by using the language of "inadmissibility," to subject deportable aliens to the same potential for indefinite detention, if they could not be removed after the commission of a serious crime, that excludable aliens had been subject to both statutorily and constitutionally for years.

The court's development of a "reasonable time" limitation for the detention of "excludable" aliens is based wholly on the Supreme Court's effective rewriting of the statute *for deportable aliens*, which is all that the Court had before it in *Zadvydas*. Applying this reasonable time limitation to excludable aliens misunderstands the Supreme Court's analysis in *Zadvydas* and, more fundamentally, the canon of constitutional avoidance. The Court in *Zadvydas* did not hold that the text, or even the legislative history, of the statute indicated Congress's intent to place a reasonable time limitation on the detention of "deportable" aliens. 533 U.S. at 697-98. Instead, the Court employed the canon of construction that Congress does not intend for its statutes to raise serious constitutional problems, also known as the canon of constitutional avoidance. *Id.* at 698. Specifically, the Court relied on the statutory text that the Attorney General "may" detain individuals after the removal period. *Id.* at 697. For the Court, this permissive language did not necessarily confer unfettered discretion on the Attorney General to detain aliens, but must have meant, because of the canon of constitutional avoidance, that the Attorney General should exercise his discretion within constitutional limits. Of course, as demonstrated above, governing Supreme Court precedent, including *Zadvydas*, clearly indicates that there is no constitutional limit on the detention of excludable aliens. Thus, the Attorney General "may," in his discretion, detain excludable aliens beyond the ninety-day removal period, and the detention need not comply with the reasonable time limitation that cabins his discretion with regard to deportable aliens arising from the canon of constitutional avoidance and nothing else.

parole and released into a halfway house program. Rosales completed the program in May 2001, and he was subsequently released into the community under conditions of supervision.

Rosales filed his pro se habeas petition in the United States District Court for the Eastern District of Kentucky on July 9, 1998. In the petition, he alleged that his "continued incarceration is illegal, it violates Due Process, statu[t]es, and case law . . . ." Rosales Joint Appendix ("Rosales J.A.") at 9. The district court initially denied Rosales's habeas petition sua sponte in October of 1998; however, Rosales filed a motion to amend, and the district court vacated its initial denial. On May 3, 1999, the district court denied with prejudice Rosales's amended habeas petition. The court concluded that under the IIRIRA, 8 U.S.C. § 1231(a)(6) (Supp. V. 1999), the Attorney General was authorized to detain Rosales indefinitely, and the court further concluded that such detention did not violate Rosales's constitutional substantive or procedural due process rights. In regard to Rosales's substantive due process claim, the court held that Rosales "ha[d] no fundamental right to be free to roam the United States." Rosales J.A. at 91. With respect to Rosales's procedural due process claim, the court held that "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." Rosales J.A. at 91 (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).

On August 4, 2000, a panel of this court heard the case on appeal, and on January 31, 2001, the panel reversed the district court's denial of Rosales's petition. Following the Supreme Court's decision in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the government petitioned the Court for certiorari, asking that the panel's decision be vacated and remanded in light of *Zadvydas*. On December 10, 2001, the Supreme Court granted the government's request. *Thomas v. Rosales-Garcia*, 122 S. Ct. 662 (2001). Following our sua sponte decision to hear *Carballo v. Luttrell* en banc, Rosales

requested that his case be heard en banc together with *Carballo*; we granted his request.

## B. Carballo

Carballo was twenty-five when he arrived in the United States, and he too was soon thereafter released on parole. By 1983, Carballo had been arrested sixteen times, for offenses including aggravated assault, burglary, grand larceny, battery, carrying a concealed weapon and an unlicensed firearm, trespassing, and possession of marijuana.[4]  In April 1983, Carballo was convicted of attempted first-degree murder, aggravated assault with a deadly weapon, and robbery, for which he received a sentence of eight years for the murder, eight years for the robbery, and five years for the aggravated assault. During his incarceration, the INS initiated exclusion proceedings, and in September 1994, an immigration judge ordered Carballo excluded, pursuant to 8 U.S.C. §§ 1182(a)(2)(A)(i)(I) (crimes of moral turpitude), (a)(2)(B) (multiple criminal convictions), and (a)(7)(A)(i)(I) (improper documentation) (1994). Upon the completion of his sentence, in June of 1988, Carballo was taken into custody by the INS.[5] He has been detained since then, although his status has been reviewed annually, pursuant to the Cuban Review Plan. While this case was pending, on December 17, 2002, Carballo was placed by the INS in a nine-month residential substance-abuse program at the Union Rescue Mission in Los Angeles.

On September 6, 1990, Carballo filed a pro se habeas petition in the United States District Court for the Northern District of Texas. Carballo claimed that the Attorney General did not have the authority to detain him beyond a reasonable time to effect his exclusion and that his continued detention

---

[4] There is also evidence that Carballo had a criminal record in Cuba.

[5] Carballo was detained by the INS in 1988 "pending exclusion proceedings," *see* Carballo J.A. at 125, even though he was not actually excluded until 1994, *see* Carballo J.A. at 132.

The court's holding, applying as it does to persons with very extensive criminal records, would obviously apply to persons otherwise blameless, who have simply been detained attempting to enter the United States:  After a maximum of six months, if such persons can not be sent elsewhere, they would have to be released into the United States, with some possible exception for individualized determinations.  Thus, if hundreds, or thousands, or hundreds of thousands of such persons present themselves at our borders, this court holds that the government of the United States is constitutionally disabled from doing anything, after a short interval, other than set all such persons at liberty in our country. While this result could be good policy, it seems inconceivable that such a disabling of congressional policy choices is consistent with a fair reading of the Immigration and Naturalization Clause of the Constitution, *see, e.g.*, *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("That the formulation of [policies pertaining to the entry of aliens and their right to remain here] is entrusted exclusively to Congress has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government"), or with the intent of anyone in adopting the Fifth and Fourteenth Amendments. The process that is due to persons to whom the government has explicitly denied entry into the country is quite different from what is due to others, as a matter of constitutional law.

Turning to the statutory argument, the court essentially makes two points. The first is that since the language of IIRIRA uses the term "inadmissible," it has, therefore, abolished the distinction between excludable and deportable aliens, for all purposes.  Op. at 33-34.  The court also remarkably concludes, by holding that the statute does not permit indefinite detention for excludable aliens as well, that Congress abolished the distinction with the result of giving excludable aliens the same rights as deportable aliens.  Of course, Congress had quite the contrary intention: it sought to tighten immigration regulations. As Congress itself provided in the text of the statute, courts were not to construe IIRIRA to "create any procedural right or benefit that is legally

aliens may have a constitutional right against indefinite detention. *Id.* at 682 (suggesting that "indefinite detention beyond the time necessary for removal" of deportable aliens "would raise serious constitutional concerns"). But the Court carefully restricted its concerns to deportable aliens. As the Court explained, "the distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Id.* at 691. Specifically, the Court recognized again that "it is well established that certain constitutional protections available to persons inside the United States are unavailable to persons outside of our geographic borders," including those who have not formally "entered" the United States, such as excludable aliens paroled into the United States. *Ibid.*

The Supreme Court specifically indicated that it was not questioning the validity of *Mezei*, and noted that the case of *Zadvydas* "differed in a *critical* respect" from *Mezei* exactly because Mezei had been detained at the border, while Zadvydas had entered the United States. *Id.* at 693 (emphasis added). The Supreme Court has recently and emphatically instructed us that we should leave the overruling of Supreme Court precedents to that Court, even if we believe, or divine, that the Court should, or will, overrule them. *Agostini v. Felton*, 521 U.S. 203, 237 (1997). No matter how much the court may disagree with the distinction between excludable and deportable aliens, it simply cannot be disputed that the controlling Supreme Court precedent makes that distinction and holds that excludable aliens do not have a constitutional right to be permitted to remain in the United States at liberty if their removal cannot be seasonably obtained.[1]

---

[1]One of the most perceptive commentators on *Mezei* argued eloquently for a more nuanced approach that would elide and break down this rigid distinction, based on a number of interesting factors. David A. Martin, *Graduated Application of Constitutional Protections for Aliens: The Real Meaning of Zadvydas v Davis*, 2001 Sup. Ct. Rev. 47. However, at every step of his article he takes it as a given that the distinction still has vitality, for the time being.

violated his constitutional substantive and procedural due process rights. A magistrate judge recommended that Carballo's petition be denied, and on November 26, 1991, the district court denied Carballo's petition. The district court concluded that the Attorney General had implied statutory authority to detain Carballo under 8 U.S.C. § 1227(a) (1988). Addressing Carballo's constitutional claims, the court held that because Carballo's detention did not constitute punishment, it did not violate substantive due process. The court further held that Carballo was entitled to only as much procedural due process as Congress granted him. Carballo did not appeal this denial.

On December 11, 1998, Carballo filed a successive habeas petition in the United States District Court for the Western District of Tennessee. The district court denied Carballo's successive petition on May 10, 1999. After finding that Carballo raised the same claims in his successive habeas petition as he had raised in his original habeas petition, the court stated that the "law of the case doctrine prevents this court from reconsidering petitioner's entirely repetitive claim." Carballo Joint Appendix ("Carballo J.A.") at 20. Carballo appealed this denial, and a panel of this court heard the case on March 9, 2001. On October 11, 2001, the panel affirmed the decision of the district court. On November 3, 2001, we sua sponte granted Carballo a rehearing en banc, vacating the decision of the panel. Carballo requested that his case be heard together with Rosales's, and we granted his request.

## II. ANALYSIS

### A. Jurisdiction

### 1. Availability of the Writ of Habeas Corpus

Both Rosales and Carballo filed petitions for habeas corpus relief in the district court under 28 U.S.C. § 2241. Recently in *INS v. St. Cyr*, the Supreme Court definitively concluded that aliens detained by the INS can petition for writs of habeas

corpus under 28 U.S.C. § 2241 — whether they are detained pursuant to the pre-1996 statutory regime, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), or IIRIRA. *INS v. St. Cyr*, 533 U.S. 289, 298-314 (2001). The Court held that "[a]t its historical core, the writ of habeas corpus has served as a means of reviewing the legality of executive detention, and it is in that context that its protections have been strongest." *Id*. at 301. "[U]nder the pre-1996 statutory scheme — and consistent with its common-law antecedents — it is clear that St. Cyr could have brought his challenge to the Board of Immigration Appeals' legal determination in a habeas corpus petition under 28 U.S.C. § 2241." *Id*. at 308. Although the government argued that certain provisions of AEDPA and IIRIRA barred habeas petitions under those statutes, the Court determined that habeas jurisdiction under § 2241 was not repealed by AEDPA or IIRIRA. *Id*. at 314; *see also Zadvydas*, 533 U.S. at 688 ("§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention."). Therefore, the district courts properly had jurisdiction over Rosales's and Carballo's habeas petitions, and we have jurisdiction to review the district courts' denials of those petitions.

### 2. Mootness — Rosales

Rosales was released from INS detention and paroled into the United States in May of 2001; the government contends that Rosales's appeal is therefore moot. "Under Article III of the Constitution, our jurisdiction extends only to actual cases and controversies. We have no power to adjudicate disputes which are moot." *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (quotation omitted). Even if a case was not moot in the district court, if it becomes moot on appeal, we must dismiss the case unless "the relief sought would, if granted, make a difference to the legal interests of the parties." *Id*. Because Rosales is still "in custody" for the purposes of 28 U.S.C. § 2241 and because

indicates, we have jurisdiction only because the INS happened to choose to detain these aliens within the boundaries of this circuit, at FCI Memphis and at Lexington. Op. at 7, 9. Since our holding is generally at odds with those of most other circuits, and explicitly at odds with four other circuits, it may well be that the INS will simply choose to remove from the Sixth Circuit all those aliens to whom this dictate would apply. *Carrera-Valdez v. Perryman*, 211 F.3d 1046, 1048 (7th Cir. 2000); *Ho v. Greene*, 204 F.3d 1045, 1054-55 (10th Cir. 2000); *Chi Thon Ngo v. INS*, 192 F.3d 390, 397-98 (3d Cir. 1999); *Guzman v. Tippy*, 130 F.3d 64, 66 (2d Cir. 1997); *see also Barrera-Echavarria v. Rison*, 44 F.3d 1441, 1445 (9th Cir. 1995); *Gisbert v. Attorney General*, 988 F.2d 1437, 1448 (5th Cir.), *amended by* 997 F.2d 1122 (5th Cir. 1993) (per curiam); *Garcia-Mir v. Meese*, 788 F.2d 1446, 1449-51 (11th Cir. 1993); *Palma v. Verdeyen*, 676 F.2d 100, 103-04 (4th Cir. 1982).

As against these newly minted rights, we have longstanding and clear Supreme Court precedent. The Supreme Court, in determining the scope of due process rights of aliens, has consistently distinguished between deportable and excludable aliens. In *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), the Court definitively held that excludable aliens, unlike aliens who are merely deportable, have no constitutional right against indefinite detention in the event that they cannot be returned to their country of origin. Indeed, the circumstances of Mezei were far more compelling than those of Rosales and Carballo. Mezei had committed no crime. He had been a longtime resident of the United States, and had always been law abiding during that time. He simply went abroad for a period of 19 months, and was detained at the border when he returned. The Supreme Court held that he could be detained indefinitely, if no country could be found to take him.

In *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Supreme Court reinforced the distinction between excludable and deportable aliens. There, the Court suggested that deportable

aggravated assault, burglary, grand larceny, battery, carrying a concealed weapon and an unlicensed firearm, trespass, and possession of marijuana. He has been convicted of attempted first-degree murder, aggravated assault with a deadly weapon, and robbery. Op. at 8. If this law cannot be applied to these persons, it seems clear that no alien, no matter his degree of criminality, can be subject to this law.

The court provides a number of soothing statements as to how certain actions against such aliens might be permissible, but it provides no principled reasons for such distinctions, nor a square holding that in fact they can be implemented. May parole conditions for excludable alien criminals be more onerous than for citizens? It implies that they may be, by referring to parole conditions and practices applied to Rosales that are not (and constitutionally may not be) applied to criminals on parole. Op. at 12 & nn.7-8. However, the opinion provides no basis for such a distinction. May Congress prescribe indefinite detention as a punishment for any violation of such conditions when similar punishment does not apply to citizen parole-violators? No answer is given. A careful reading of the court's logic and rhetoric would indicate that the very same type of attack that is mounted against the congressional mandate here would be found congenial by this court when mounted against any such distinction. Would any more draconian punishment, such as that suggested above, or an enactment that excludable aliens could be detained indefinitely as punishment for any criminal infraction, pass the muster of this court, under its broad rubric of due process, or under its application of the Eighth Amendment? In oral argument, it was indicated that any violation of parole, under current law, was punishable by at most one year's additional detention. Would it violate the Ex Post Facto Clause for any alien already excluded from this country to have applied to him indefinite detention? Again, no logic is given that would answer the question.

The court's approach leads to a host of practical problems, both at the level of this circuit and of the nation. As the court

the relief he seeks, if granted, would make a difference to his legal interests, we conclude that his appeal is not moot.

The government argues that "if a prisoner is released from custody during the pendency of his case, his habeas petition becomes moot." Gov't Supp. Br. re Rosales at 19. In *Jones v. Cunningham*, 371 U.S. 236 (1963), however, the Supreme Court held that a paroled prisoner was in the custody of his state parole board for the purposes of 28 U.S.C. § 2241. "While petitioner's parole releases him from immediate physical imprisonment, it imposes conditions which significantly confine and restrain his freedom; this is enough to keep him in the 'custody' of the members of the Virginia Parole Board within the meaning of the habeas corpus statute . . . ." *Jones*, 371 U.S. at 243; *see also DePompei v. Ohio Adult Parole Auth.*, 999 F.2d 138, 140 (6th Cir. 1993). Although Rosales's parole was not based on a criminal conviction, it imposes similarly restrictive conditions. *See* Rosales Supp. J.A. at 4-5 (Conditions of Parole). Therefore, we conclude that even though he has been paroled into the United States, Rosales is still in the custody of the INS for the purposes of his habeas petition.[6]

Our inquiry into whether Rosales's claim is moot cannot end, however, with a determination of custody. In *Spencer v. Kemna*, the Supreme Court determined that a petitioner's release did not by itself moot his habeas petition, but the Court then explained that "[t]he more substantial question . . . is whether petitioner's subsequent release caused the petition to be moot because it no longer presented a case or controversy under Article III, § 2, of the Constitution."

---

[6]We note that even if Rosales had been released from INS custody, such release would not necessarily moot his appeal. For the purposes of the habeas statutes, a petitioner need only be "in custody" at the time the petition was filed. *See Spencer v. Kemna*, 523 U.S. 1, 7 (1998). Rosales was in INS detention when he filed his habeas petition, and thus the government's argument regarding custody fails regardless of whether Rosales was in detention or released on parole at the time of his appeal.

*Spencer v. Kemna*, 523 U.S. 1, 7 (1998). Rosales petitioned the district court for habeas relief, alleging that his continued *detention* by the INS was impermissible on both statutory and constitutional grounds. We thus must ask whether Rosales's claim is moot because he is no longer being *detained* by the INS. "The parties must continue to have a personal stake in the outcome of the lawsuit. This means that, throughout the litigation, the plaintiff must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Id*. (quotations and citations omitted).

Although Rosales is not currently being detained, his immigration parole can be revoked by the INS at any time for almost any reason.[7] Unlike parole granted following incarceration for a criminal conviction, Rosales need not do anything for the INS to revoke his parole; for instance, the INS can revoke Rosales's parole if it deems such revocation

---

[7]Under the Cuban Review Plan:

> The Associate Commissioner for Enforcement [of the INS] may, in the exercise of discretion, grant parole to a detained Mariel Cuban for emergent reasons or for reasons deemed strictly in the public interest. . . . A decision to release on parole may contain such special conditions as are considered appropriate. . . .
>
> The Associate Commissioner for Enforcement shall have authority, in the exercise of discretion, to revoke parole in respect to Mariel Cubans. A district director may also revoke parole when, in the district director's opinion, revocation is in the public interest and circumstances do not reasonably permit referral of the case to the Associate Commissioner. Parole may be revoked in the exercise of discretion when, in the opinion of the revoking official:
>
> (1) The purposes of parole have been served;
> (2) The Mariel Cuban violates any condition of parole;
> (3) It is appropriate to enforce an order of exclusion or to commence proceedings against a Mariel Cuban; or
> (4) The period of parole has expired without being renewed.

8 C.F.R. § 212.12(b)(1) & (h) (2002).

---

government may not wantonly execute or torture a person, and then extrapolates that the government is disabled from applying its immigration and criminal laws to such excludable aliens in ways that are different from those that apply to deportable aliens.

This holding has nothing to do with what we would generally classify as "process." Rosales and Carballo have had that, in abundance. They have been able to argue, before independent arbiters, that they are not the persons to whom the law is intended to apply, that they do not come within the reach of the law, and any other procedural issues they may wish to raise. They have had this review before the various levels of the administrative bureaucracy prescribed by Congress and before the courts of the United States. It cannot be disputed that Rosales and Garcia are both "excludable" aliens in that they sought admission to the United States, were detained at the border before entering the United States, and were paroled into the United States only as a matter of grace and on the condition that their parole may be revoked at any time, and especially for the commission of criminal offenses.

All of the many agencies and courts to have considered their cases have ruled that they come within the mandate of Congress that persons who are "excludable" and have committed crimes of sufficient seriousness should be removed from the United States and, if not immediately deportable, be detained at the discretion of the Attorney General. There is little doubt that Carballo and Rosales fit in this category of excludable aliens who have committed serious offenses. Simply to detail the crimes of which they have been convicted, and others of which they have been arrested, makes this abundantly clear. The highlights of Rosales's criminal career include arrests for aggravated battery, possession of marijuana, burglary and loitering and convictions for possession of marijuana, resisting arrest, grand theft, burglary, grand larceny, escape from a penal institution, and conspiracy with intent to distribute cocaine. Op. at 6. Carballo, no less prolific, has been arrested for

---

**DISSENT**

---

BOGGS, Circuit Judge, dissenting.  In deciding these two consolidated cases today, the court makes two holdings that are both quite striking, novel and, in my opinion, incorrect. I therefore respectfully dissent.  The court first finds that Congress, in the course of enacting a statute that virtually all concede was designed to tighten immigration procedures, instead amended the statute in such a way as to obliterate a longstanding distinction that recognized the lessened constitutional protection of persons who had been affirmatively denied entry into the United States, detained at the border, and physically allowed inside the country only as a matter of legislative grace.  Instead, the court finds that Congress deliberately accorded such persons the same status as long-time permanent residents.  Second, and perhaps even more disturbing, the court essentially accords such persons *all* of the due process rights of American citizens.  The court therefore makes it impossible, in our circuit at least, for the United States government to detain for more than six months any number of aliens who present themselves at our border and are denied entry, or are paroled into the United States only conditionally.  It further extends this status regardless of whatever criminal acts those persons may have committed. I believe that this result cannot be derived from the text of the Constitution and is contrary to existing Supreme Court precedent, which the Supreme Court has recently explicitly relied on and refused to overrule.

To begin with the broader holding, the court finds that full due process applies to all persons at  or within the borders of the United States, and that such due process is not merely procedural, but essentially accords any such person a right to remain at liberty in the United States comparable to that accorded to United States citizens.   It does this by commencing with the unremarkable proposition that the

to be "in the public interest."  *See* 8 C.F.R. § 212.12(h) (2002).  Thus, Rosales's "release" into the United States does not constitute a termination of detention; it simply constitutes a reprieve from detention.[8]  Under these circumstances, we believe that Rosales is threatened with an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision.  We therefore conclude that Rosales's appeal is not moot.

Two other strands of the Supreme Court's mootness jurisprudence support this conclusion.  First, the Supreme Court has held that "[i]t is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.' . . . '[I]f it did, the courts would be compelled to leave [t]he defendant . . . free to return to his old ways.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.10 (1982)). Second, the Court has long recognized an exception to the mootness doctrine for cases that are "capable of repetition, yet evading review."  This exception applies where "(1) the challenged action [is] in its duration too short to be fully litigated prior to cessation or expiration, and (2) there [is] a

---

[8] The statutory provision authorizing the Attorney General to parole Rosales provides as follows:

The Attorney General may . . . in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

8 U.S.C. § 1182(d)(5)(A) (2000).

reasonable expectation that the same complaining party [will] be subject to the same action again." *Spencer*, 523 U.S. at 17 (quotation omitted); *see also Suster v. Marshall*, 149 F.3d 523, 527 (6th Cir. 1998), *cert. denied*, 525 U.S. 1114 (1999).

To determine whether a case has been mooted by the defendant's voluntary conduct, the Supreme Court has articulated the following standard: "A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 189. As discussed above, the INS can revoke Rosales's parole at any time. We have noted that "cessation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties." *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990) (quoting 13A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3533.7 (2d ed. 1984)). The Ninth Circuit has even held that a Mariel Cuban's parole did moot his habeas petition because, on the basis of government declarations, the court concluded that "the alleged wrong will not recur." *Picrin-Peron v. Rison*, 930 F.2d 773, 776 (9th Cir. 1991). In *Picrin-Peron*, the government stated in its dismissal motion that "[a]bsent Picrin's reinvolvement with the criminal justice system, a change in the Cuban government enabling him to return to Cuba, or the willingness of a third country to accept him, he will be paroled for another year," and an INS official reiterated the statement in a declaration made under oath. *Id*. The government in Rosales's case, however, has made no such promise, nor has the government made it "absolutely clear" in any other way that potentially indefinite detention of Rosales by the INS cannot reasonably be expected to recur.

We also believe that the indefinite detention of Rosales by the INS is a case "capable of repetition, yet evading review." Because the INS can revoke Rosales's parole at any time and has in fact revoked Rosales's parole twice in the past fifteen years, there is a reasonable expectation that Rosales will again

significant likelihood of removal in the reasonably foreseeable future. Although the government presented evidence of our continuing negotiations with Cuba over the return of Cuban nationals excluded from the United States, neither Rosales nor Carballo is currently on a list of persons to be returned.

### III. CONCLUSION

Under either the Supreme Court's construction in *Zadvydas* or our construction in regard to excludable aliens, we read 8 U.S.C. § 1231(a)(6) (2000) to contain an implicit reasonable time limitation. Because there is no significant likelihood that Rosales and Carballo will be removed in the reasonably foreseeable future and because the INS has detained them longer than six months, we conclude that the INS's detention of Rosales and Carballo is no longer reasonable and is therefore not authorized by IIRIRA's post-removal-period detention provision. We **REVERSE** the district courts' denials of Rosales's and Carballo's habeas petitions, and we **REMAND** for proceedings consistent with this opinion.

Court's holding in *Mezei,* that the indefinite detention of excludable aliens is constitutionally permissible, we believe such a conclusion to be fatally undermined by the Court's later decisions in the *Salerno* line of cases.

### 3.    Statutory Construction of § 1231(a)(6) as Applied to Excludable Aliens

"[T]he canon of constitutional avoidance has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001). Therefore, prior to construing § 1231(a)(6) (2000) to contain a reasonable time limitation, the *Zadvydas* Court addressed whether Congress had clearly indicated an intent in the statute to authorize indefinite post-removal-period detention of aliens whose removal cannot be effected. *Zadvydas*, 533 U.S. at 696-99. After reviewing the history of the statute, the Court concluded that "[w]e have found nothing in the history of these statutes that clearly demonstrates a congressional intent to authorize indefinite, perhaps permanent, detention. Consequently, interpreting the statute to avoid a serious constitutional threat, we conclude that, once removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id.* at 699. We again see no reason to interpret the statute any differently for excludable aliens.[35]

Like the Supreme Court in *Zadvydas*, then, we recognize six months as a presumptively reasonable period for the post-removal detention of excludable aliens. "After this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Zadvydas*, 533 U.S. at 701. In the instant cases, we conclude that there is no

---

[35]We reiterate that in enacting IIRIRA, Congress itself abolished the distinction between deportable and excludable aliens. *See infra* note 1.

be subject to indefinite INS detention.[9] Moreover, because the INS can grant Rosales parole at any time, such detention can always evade review. The government argues that "there is no basis for concluding that when a Mariel Cuban's parole is revoked, the alien will always be rereleased in a time that is so short that the legality of his detention will evade review." Gov't Supp. Br. re Rosales at 22-23. It is true that the Cuban Review Plan requires the INS to follow certain procedures before releasing a Mariel Cuban into the United States. However, the INS granted Rosales parole in the two years between the denial of his habeas petition by the district court and our review, and we have every reason to believe both that the INS could again accomplish a release in the same amount of time and that another habeas petition filed by Rosales would take at least as long as the instant case in

---

[9]The government points out that the INS based its previous revocation of Rosales's parole on his criminal conduct, and the government therefore argues that Rosales himself controls whether the INS will indefinitely detain him again. The Supreme Court has held that "for purposes of assessing the likelihood that state authorities will reinflict a given injury, we generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury." *Honig v. Doe*, 484 U.S. 305, 320 (1988). However, as discussed above, the INS can revoke Rosales's parole for a number of reasons — some of which are within Rosales's control, but some of which are not. In *Olmstead v. Zimring*, 527 U.S. 581 (1999), mentally disabled patients challenged their confinement in segregated as opposed to community-based programs. Although the patients were in community-based programs by the time the case was heard, the Court held that "in view of the multiple institutional placements [the patients] have experienced, the controversy they brought to court is 'capable of repetition, yet evading review.'" *Olmstead*, 527 U.S. at 594 n.6. Because Rosales's parole could be revoked for reasons that are not within his control, his parole is more like the institutional placement described in *Olmstead* than parole in the traditional, criminal sense as described in *Spencer*, 523 U.S. at 15, in which the parolee can control whether his parole is revoked.

arriving in this court.  *See Honig v. Doe*, 484 U.S. 305, 320-22 (1988).[10]

### 3.  Successive Habeas Petition — Carballo

The government argues on appeal that "Carballo's petition is an abuse of the writ [of habeas corpus] because it is a second, successive petition that raises the same claims that were denied on the merits in his first petition, and he cannot point to any exception to overcome the bar on successive petitions."   Gov't Supp. Br. re Carballo at 57.[11]   "A

---

[10]We note that the government does not claim that Carballo's recent placement in a residential substance-abuse recovery program moots his case.  As the government observes, Carballo's habeas petition challenges the government's authority to restrain his liberty by sending him to a halfway house or other restrictive program.

[11]In the district court, the government also argued that Carballo's successive habeas petition was barred by the doctrines of res judicata and law of the case; the district court denied Carballo's petition on the theory of law of the case.  The government does not raise the law of the case argument on appeal, and, as the doctrine is prudential rather than jurisdictional, we need not address it.  *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988) ("[A] district court's adherence to law of the case cannot insulate an issue from appellate review.").  We note, however, that it is not at all clear to us that the law-of-the-case doctrine should apply to successive habeas petitions.  "Law-of-the-case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit."  18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 (2d ed. 2002).  Whether successive habeas petitions constitute stages in a single, continuing lawsuit is a question that should be carefully considered.  *See Lacy v. Gardino*, 791 F.2d 980, 984-85 (1st Cir.), *cert. denied*, 479 U.S. 888 (1986).  Although we do not decide the question, we, like the First Circuit, think it likely that each habeas petition is a separate and distinct case.  *See id.*; *see also McClesky v. Zant*, 499 U.S. 467, 479-85 (1991) (explaining that the "abuse of the writ" doctrine arose because, "[a]t common law, res judicata did not attach to a court's denial of habeas relief. [A] refusal to discharge on one writ [was] not a bar to the issuance of a new writ." (quotation omitted)); *but cf. Shore v. Warden, Stateville Prison*, 942 F.2d 1117, 1123 (7th Cir. 1991), *cert. denied*, 504 U.S. 922

---

of national security.").   There are, however, no special circumstances involving national security in the instant cases.

Second, we believe that the Court's implicit conclusion in *Mezei* is eclipsed by the conclusion drawn from the *Salerno* line of cases that the indefinite detention of excludable aliens does raise constitutional concerns.  All of the cases that the *Zadvydas* Court relied on in assessing the constitutional due process concerns implicated by the indefinite detention of aliens who are removable on grounds of deportability were decided after *Mezei*.  *See, e.g., Kansas v. Hendricks*, 521 U.S. 346 (1997); *Foucha v. Louisiana*, 504 U.S. 71 (1992); *United States v. Salerno*, 481 U.S. 739 (1987); *Jackson v. Indiana*, 406 U.S. 715 (1972).   In these cases, the contours of constitutionally permissible civil detention are rigorously delineated — a substantial jurisprudential development from the time that *Mezei* was decided.  As we explained above, the *Zadvydas* Court held on the basis of these cases that civil detention is constitutionally permissible only "in certain special and narrow non-punitive circumstances where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint."  *Zadvydas*, 533 U.S. at 690.  As we also explained above, we do not believe that any such special circumstances outweigh Rosales's and Carballo's interest in avoiding indefinite and potentially permanent INS detention.  Although we must — as a lower federal court — apply all pertinent Supreme Court precedent, it is not our role to reconcile cases whose application leads to opposite conclusions.[34]   Therefore, to the extent that we could conclude, in reliance on the

---

[34]We note that a possible means of reconciling *Mezei* and the *Salerno* line of cases is to limit *Mezei* to a decision involving national security risks.  In *Salerno*, the Court specifically stated that national emergencies could constitute a special justification that would outweigh an individual's constitutionally protected liberty interest.  *See Salerno*, 481 U.S. at 748 ("[I]n times of war or insurrection, when society's interest is at its peak, the Government may detain individuals whom the government believes to be dangerous.").

*Mezei* does not govern the outcome of the instant cases for two reasons. First, the *Mezei* Court explicitly grounded its decision in the special circumstances of a national emergency and the determination by the Attorney General that Mezei presented a threat to national security.[33] The Court, in fact, located the Attorney General's authority to exclude and detain Mezei in the Passport Act of 1918. *Mezei*, 345 U.S. at 210-11 ("Congress expressly authorized the President to impose additional restrictions on aliens entering or leaving the United States during periods of international tension and strife. That authorization, originally enacted in the Passport Act of 1918, continues in effect during the present emergency."). Moreover, in regard to the proposition that Mezei be released on immigration parole, the Court stated: "An exclusion proceeding *grounded on danger to the national security . . .* presents different considerations; neither the rationale nor the statutory authority for such release exists." *Id.* at 216. Particularly in a post-September 11 world, we recognize that in special circumstances prolonged post-removal-period detention may be warranted. *See Zadvydas*, 533 U.S. at 696 ("Neither do we consider terrorism or other special circumstances where special arguments might be made for forms of preventive detention and for heightened deference to the judgments of the political branches with respect to matters

---

like the present cases, involves indefinite detention." *Zadvydas*, 533 U.S. at 693. Therefore, we address *Mezei* as "it involves indefinite detention."

[33]According to the Court, Mezei's exclusion "rested on the finding that [his] entry would be prejudicial to the public interest for security reasons." *Mezei*, 345 U.S. at 208. The Court did not explain the precise nature of the security threat, but *Mezei* was decided during the Korean War, and the Court did specifically note that Mezei "left the United States and remained behind the Iron Curtain for 19 months." *Id.* at 214. In addition, Justice Jackson in dissent, stated that: "[M]y apprehensions about the security of our form of government are about equally aroused by those who refuse to recognize the dangers of Communism and those who will not see danger in anything else." *Id.* at 227 (Jackson, J., dissenting).

'successive petition' raises grounds identical to those raised and rejected on the merits on a prior petition." *Schlup v. Delo*, 513 U.S. 298, 318 n.34 (1995) (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 444 n.6 (1986)).[12] Carballo indeed presented the same claims for relief in the petition that gave rise to this appeal as he presented in his habeas petition in the United States District Court for the Northern District of Texas in 1990. However, applying the traditional successive-petition doctrine, we conclude that we should reach the merits of Carballo's petition because there has been an intervening change in the law.

Carballo petitioned the district court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. As discussed above, the Supreme Court recently reiterated that § 2241 is the appropriate means for an alien to challenge his detention by the INS. *INS v. St. Cyr*, 533 U.S. at 298-314.[13] Under AEDPA, there are strict "gatekeeping" provisions restricting the ability of federal courts to hear successive habeas petitions. *See* 28 U.S.C. §§ 2244(a) & (b) (2000); *Felker v. Turpin*, 518 U.S. 651, 662-63 (1996). By their own terms, however, these provisions do not apply to petitioners like Carballo who are not in custody pursuant to a conviction in state or federal court. *See Barapind v. Reno*, 225 F.3d 1100,

---

(1992) ("[T]he law of the case doctrine is applicable to habeas proceedings."); *Raulerson v. Wainwright*, 753 F.2d 869, 875 (11th Cir. 1985) (applying the law of the case doctrine to a successive habeas petition).

[12]"An 'abusive petition' occurs 'where a prisoner files a petition raising grounds that were available but not relied upon in a prior petition, or engages in other conduct that disentitle[s] him to the relief he seeks.'" *Schlup*, 513 U.S. at 319 n.34 (quoting *Kuhlmann*, 477 U.S. at 444 n.6).

[13]In fact, as an executive detainee, Carballo could file a habeas petition *only* under § 2241. 28 U.S.C. § 2255 applies to persons "in custody under sentence of a court established by Act of Congress," and 28 U.S.C. § 2254(a) applies to persons "in custody pursuant to the judgment of a State court."

1111 (9th Cir. 2000). In *Barapind*, the Ninth Circuit explained that "§ 2244(a) cannot apply to a § 2241 petition filed by an INS detainee such as Barapind because § 2244(a) bars successive petitions seeking review of the propriety of a detention '*pursuant to a judgment of a court of the United States*.'" *Id.* (emphasis in original). "Because § 2244(b) makes no reference to habeas petitions filed under § 2241, but rather, applies only to petitions filed pursuant to 28 U.S.C. § 2254, the prior-appellate-review provisions of § 2244(b) do not apply to habeas petitions filed under § 2241." *Id.*; *see also Valona v. United States*, 138 F.3d 693, 694 (7th Cir. 1998).[14]

Therefore, we apply the pre-AEDPA law governing successive habeas petitions to determine whether we should hear Carballo's petition. The Supreme Court held in *Sanders v. United States* that, "[c]ontrolling weight may be given to denial of a prior application for federal habeas corpus or § 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application." *Sanders v. United States*, 373 U.S. 1, 15 (1963) (footnote omitted); *see also Lonberger v. Marshall*, 808 F.2d 1169, 1173 (6th Cir.), *cert. denied*, 481 U.S. 1055 (1987).[15]

[14]We note that because Carballo could file a habeas petition only under § 2241, the limitations we have imposed on federal prisoners who file § 2241 petitions do not apply. *See, e.g., Charles v. Chandler*, 180 F.3d 753 (6th Cir. 1999) (holding that federal prisoners generally may not circumvent the requirements of § 2255 by filing a second or successive habeas petition under § 2241).

[15]In subsequent cases involving prisoners challenging their incarceration pursuant to their convictions under state or federal law, the Supreme Court limited the *Sanders* test for when federal courts may consider the merits of successive habeas petitions. In *McClesky*, 499 U.S. at 493-94, the Court required a showing of "cause and prejudice," developed in the context of procedural default, by prisoners filing second

the *Zadvydas* Court explicitly refused to address the continuing validity of *Mezei*: "we need not consider the aliens' claim that subsequent developments have undermined *Mezei*'s legal authority." *Zadvydas*, 533 U.S. at 694. Inasmuch as the Court in *Mezei* permitted the potentially indefinite detention of an excludable alien, however, we agree with the government that we must address *Mezei*'s ramifications for Rosales and Carballo.[32] We believe that

[32]We note that we believe that the government considerably overstates the holding of *Mezei*. In its brief before the district court, the government described the Court's holding in *Mezei* as follows: "[The Court] held that the 'continued exclusion' via detention of an inadmissible alien does 'not * * * deprive[] him of any statutory or constitutional right,' *even when custody is prolonged* because no other country is willing to accept the alien." Gov't Br. re Rosales at 20 (quoting *Mezei*, 345 U.S. at 208-10, 215-16) (emphasis added). In *Mezei*, an excludable alien was denied reentry into the United States at Ellis Island and ordered excluded; because other countries would not take him in, Mezei was detained on Ellis Island. After one year of detention, Mezei filed a habeas petition in a federal district court claiming that his exclusion without a hearing violated his constitutional rights under the Due Process Clause of the Fifth Amendment. *Mezei*, 345 U.S. at 207. The Supreme Court held that Mezei, as an excludable alien, was not entitled to a hearing: "Whatever the *procedure* authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id.* at 212 (quotation omitted) (emphasis added); *see also Kim Ho Ma v. Reno*, 208 F.3d 815, 823 (9th Cir. 2000), *vacated and remanded sub nom. Zadvydas v. Davis*, 533 U.S. 678 (2001) ("In *Mezei*, the Court relied on the entry fiction . . . in holding that an excludable alien is not entitled to procedural due process."). The *Mezei* Court then went on to hold that "we do not think that respondent's *continued exclusion* deprives him of any statutory or constitutional right." *Id.* at 215 (emphasis added).

We believe that the Court in *Mezei*, therefore, did not address indefinite or potentially indefinite *detention* as a violation of Mezei's substantive due process rights. Inasmuch as Rosales and Carballo do not challenge their exclusion, we believe that their cases present a different question. We recognize, however, that other circuits have not read *Mezei* in this way. *See, e.g., Carrera-Valdez*, 211 F.3d at 1048 (stating that the *Mezei* Court "held that an excludable alien may be detained indefinitely when his country of origin will not accept his return"); *Kim Ho Ma*, 208 F.3d at 823 ("[T]he Court held that Mezei could be detained indefinitely on Ellis Island."). Moreover, the Court in *Zadvydas* noted that "*Mezei*,

serious constitutional concerns than the indefinite and potentially permanent detention of the aliens in *Zadvydas*. We emphasize that we understand that this situation, involving criminal aliens whose removal cannot be effected, is a difficult one:  we, too, find it unpalatable that inadmissible aliens who have previously abused the privilege of immigration parole should be permitted additional opportunities to live in this country simply because their country of origin will not have them back.  As the *Zadvydas* Court explained, though, "[t]he choice . . . is not between imprisonment and the alien 'living at large.'  It is between imprisonment and supervision under release conditions that may not be violated."  *Id.*[31]  Moreover, we find it not only unpalatable but also untenable to conclude that under the Due Process Clause of the Fifth Amendment persons living in the United States — whether by our choice or not — could be subjected to a life sentence in prison simply because their country of origin will not have them back.  A life sentence in prison, in fact, seems to us no less impermissible than the government's torture or summary execution of these aliens.

The government also argues that in *Mezei,* the Supreme Court held that the indefinite detention of an excludable alien was permissible under the Due Process Clause of the Fifth Amendment, and the government further argues that the *Zadvydas* Court reaffirmed *Mezei*.  We note at the outset that

---

[31]For instance, Rosales's conditions of parole include the following restrictions, any violation of which "may result in the revocation of your parole and your return to an appropriate INS detention facility," Rosales Supp. J.A. at 4 (Conditions of Parole):

1.   You shall not leave the geographic limits fixed by the I-94 without written permission from the INS District Director. . . .

7.   You shall abide by the curfew rules established by the resettlement program. . . .

11.  You shall not have visitors on the premises of the resettlement program without the permission of the Program Director.

Rosales Supp. J.A. at 4.

---

Because Carballo made the same claims in the Northern District of Texas as he made in the district court below, and because the Northern District of Texas denied these claims on the merits, the first two prongs of the *Sanders* test for successive habeas petitions clearly apply.  In regard to the third prong, the *Sanders* Court stated that "[e]ven if the same ground was rejected on the merits on a prior application, it is open to the applicant to show that the ends of justice would be

---

or subsequent habeas petitions that raise new claims.  *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992), extended this requirement to prisoners filing successive habeas petitions.  *See also Schlup*, 513 U.S. at 318 ("[A] habeas court may not ordinarily reach the merits of successive claims . . . absent a showing of cause and prejudice.") (citation omitted).  Carballo, however, is not being detained on the basis of a criminal conviction under either state or federal law.  Although it would be possible for him to show "cause," we do not see how he could show "prejudice" without a trial and conviction.  Therefore, we conclude that the Court's cause and prejudice requirement does not apply to Carballo.

We note that if the cause and prejudice requirement did apply to Carballo, we would conclude that he has cause to file a successive habeas petition.  The Ninth Circuit has construed "cause" in the context of successive habeas petitions to mean "cause for bringing a petition that fails to present a new ground for relief.  In other words, a petitioner must show cause for seeking review of the same claim twice — such as the discovery of new facts, or an intervening change in the law, that warrants reexamination of the same ground for relief raised in an earlier petition."  *Campbell v. Blodgett*, 997 F.2d 512, 524 (9th Cir. 1992), *cert. denied*, 510 U.S. 1215 (1994).  For the reasons stated below in regard to the "ends of justice" prong of the *Sanders* test, we believe that there has been an intervening change in the law from the time that Carballo filed his habeas petition in the Northern District of Texas.

Furthermore, the Supreme Court has recognized a "miscarriage of justice" exception to the cause and prejudice requirement, and the Court has equated this exception with the "ends of justice" prong of the *Sanders* test.  *See Sawyer*, 505 U.S. at 339.  Arguably, the Court has limited this exception for prisoners challenging their state or federal convictions to cases in which "the petitioner 'establish[es] that under the probative evidence he has a colorable claim of factual innocence.'"  *Id.* (quoting *Kuhlmann*, 477 U.S. at 454).  However, like the cause and prejudice requirement itself, the "actual innocence" requirement cannot apply to Carballo in that he is not being detained on the basis of a conviction for a state or federal crime.

served by permitting the redetermination of the ground." *Sanders*, 373 U.S. at 16. "If purely legal questions are involved, the applicant may be entitled to a new hearing upon showing an intervening change in the law." *Id*. at 17; *see also Lonberger*, 808 F.2d at 1174. Applying *Sanders*, Carballo argues that IIRIRA and the Supreme Court's decision in *Zadvydas* constitute an intervening change in the law and thus that the ends of justice would be served by considering the claims in his successive habeas petition. *See* Carballo's Supp. Br. at 13-14. The government, however, also applying *Sanders*, contends that *Zadvydas* does not constitute a change in the law and that IIRIRA does not apply to Carballo. *See* Gov't Supp. Br. re Carballo at 57-62.

In our analysis below, we conclude that IIRIRA is the appropriate statute to apply to Rosales and Carballo. We also agree with Carballo that IIRIRA, and the Supreme Court's interpretation of its post-removal-period detention provision in *Zadvydas*, constitute an intervening change in the law sufficient to warrant our review of his petition. Although the post-removal-period detention provision of IIRIRA is in itself not substantially different from the detention provision in pre-IIRIRA law, the Supreme Court's construction of IIRIRA's post-removal-period detention provision in *Zadvydas* is different from the construction of the detention provision in pre-IIRIRA law that prevailed in most circuits at the time Carballo filed his original habeas petition. Therefore, Carballo is able in this habeas petition to raise legal arguments that he was unable to raise in his habeas petition in the Northern District of Texas. *See Collins v. Zant*, 892 F.2d 1502, 1505 (11th Cir.), *cert. denied*, 498 U.S. 881 (1990) ("In analyzing 'the ends of justice,' a court may consider new *arguments* (based, for example, on intervening changes in the law) that a petitioner raises in support of an old claim.") (emphasis in original). Because, moreover, such arguments go to the constitutionality of and statutory authorization for Carballo's indefinite detention, it serves the ends of justice for

constitutional right to enter the United States, the INS must be permitted to detain them indefinitely if they cannot be removed.

We recognize that excludable aliens do not have a constitutional right to enter or be admitted to the United States; indeed, no alien has a constitutional right to enter or be admitted to the United States. We also recognize that the INS is faced with an extremely difficult situation in the case of aliens who legally *cannot* enter or be admitted to the United States, yet who, by virtue of the fact that their country of origin will not repatriate them, are *in* the United States. However, the Supreme Court in *Zadvydas* confronted much the same situation. Aliens who are removed on grounds of deportability do not have a constitutional right to stay in the United States, and, as the Court recognized, Congress has plenary power to create immigration law. *Zadvydas*, 533 U.S. at 695-96. "But that power is subject to important constitutional limitations." *Id*. at 695. Like the Supreme Court, we do not question "the right of Congress to remove aliens, to subject them to supervision with conditions when released from detention, or to incarcerate them where appropriate for violations of those conditions." *Id*. "Rather, the issue we address is whether aliens that the Government finds itself unable to remove are to be condemned to an indefinite term of imprisonment within the United States." *Id*.

The Supreme Court in *Zadvydas* concluded that "for the reasons we have set forth, we believe that an alien's liberty interest is, at the least, strong enough to raise a serious question as to whether, irrespective of the procedures used, the Constitution permits detention that is indefinite and potentially permanent." *Zadvydas*, 533 U.S. at 696. We draw the same conclusion with regard to excludable aliens. If the Due Process Clause of the Fifth Amendment applies to Rosales and Carballo, as we believe that it must, we do not see how we could conclude that the indefinite and potentially permanent detention of Rosales and Carballo raises any less

future immigration proceedings' and '[p]reventing danger to the community.'" *Id.* (quoting Brief for Respondents in No. 99-7791, p.24). The Court concluded that the flight prevention justification was "weak or nonexistent where removal seems a remote possibility at best," and the dangerousness justification could not be supported by alien status alone. *Id.* at 690-91. Explaining that "[i]n cases in which preventive detention is of potentially *indefinite* duration, we have also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger," the Court held that an alien's status as removable did not constitute such a special circumstance because it "bears no relation to a detainee's dangerousness." *Id.* at 691-92 (emphasis in original).

Rosales's and Carballo's status as excludable aliens does not alter the above analysis. An excludable alien who cannot be removed to his country of origin presents no greater risk of flight than the aliens who could not be removed to their countries of origin in *Zadvydas*; nor does an excludable alien's status relate any more to his dangerousness than the removable status of the aliens in *Zadvydas* related to their dangerousness.[30] However, the government contends that because Rosales and Carballo are excludable aliens, their detention should not be subject to the same analysis as the detention of the aliens in *Zadvydas*. According to the government, because excludable aliens do not have a

---

[30]The INS's detention of Rosales and Carballo is as potentially permanent as was the INS's detention of the aliens in *Zadvydas*. Although Rosales's and Carballo's detention is governed by the Cuban Review Plan, the Plan, like the general regulations in effect at the time of the Court's decision in *Zadvydas*, does not limit the period of possible post-removal-period detention. *Compare* 8 C.F.R. § 241.4 (2001) *with* 8 C.F.R. § 212.12 (2002). In fact, under the Cuban Review Plan, post-removal-period detainees may *only* be released on parole "for emergent reasons or for reasons deemed strictly in the public interest." 8 C.F.R. § 212.12(b)(1). Therefore, the likelihood that they will be detained indefinitely is much greater.

us to reach the merits of Carballo's successive habeas petition.[16]

## B. Standard of Review

We review de novo a district court's denial of a petition for the writ of habeas corpus filed under 28 U.S.C. § 2241. *Asad v. Reno*, 242 F.3d 702, 704 (6th Cir. 2001).

## C. Applicable Statute

There are two versions of the Immigration and Nationality Act ("INA"), codified as amended at 8 U.S.C. § 1101 *et seq.*, that could potentially apply to the petitioners in the present appeals: (1) the version of the INA in effect between 1990 and 1995[17]; and (2) the INA as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").[18] Rosales and Carballo argue that we should apply IIRIRA in assessing whether their detention by the INS is a violation of statutory and constitutional law; the

---

[16]We would still conclude that IIRIRA and its limiting construction in *Zadvydas* constituted a sufficient intervening change in the law to warrant our review of Carballo's successive habeas petition even if we had concluded that IIRIRA was not the appropriate statute to apply to Carballo. As we explain, *infra*, whether IIRIRA applies to Carballo is a complicated question; at the very least, the *Zadvydas* Court's application of IIRIRA to a habeas petitioner similarly situated to Carballo raises a new question as to what statute authorizes Carballo's detention.

[17]The INA was amended in 1990 by the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4471 (1990).

[18]IIRIRA was enacted as Division C of the Department of Defense Appropriation Act, 1997, Pub. L. No. 104-208, 110 Stat. 3009-546 (1996), and it was amended by Pub. L. No. 104-302, 110 Stat. 3656 (1996).

government contends that we should instead apply the law in effect between 1990 and 1995.[19]

According to the petitioners, we should apply IIRIRA because, in *Zadvydas*, the Supreme Court applied IIRIRA "to a petitioner who had been placed in deportation proceedings and ordered deported *prior* to the statute's April 1, 1997 effective date." Rosales's Supp. Br. at 9 (emphasis in original). The Supreme Court in *Zadvydas* did apply IIRIRA to such a petitioner, Zadvydas, but it did not explain its reason for so doing. *See Zadvydas*, 533 U.S. at 682. Moreover, the government and the petitioner in *Zadvydas* agreed on what statute to apply. *See Zadvydas v. Underdown*, 185 F.3d 279, 286-87 (5th Cir. 1999), *vacated and remanded sub nom. Zadvydas v. Davis*, 533 U.S. 678 (2001). According to the government, § 309(c)(1) of IIRIRA precludes us from applying IIRIRA to an alien excluded prior to the statute's effective date. Section 309(c)(1), entitled "General rule that new rules do not apply," provides that:

> Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings before the title III-A effective date [April 1, 1997] — (A) the amendments made by this subtitle shall not apply, and (B) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

8 U.S.C. § 1101 (2000), note regarding "Effective Dates" (reprinting IIRIRA § 309(c)(1)). Inasmuch as the Supreme Court in *Zadvydas* did not discuss the application of IIRIRA to Zadvydas, we cannot simply assume that such application

---

[19]We note that Rosales was excluded from the United States on July 10, 1986, he began the detention from which his habeas petition arose in May of 1997, and he filed his habeas petition in 1998. Carballo began the detention from which his habeas petition arose in 1988, he filed his habeas petition in 1990, and he was excluded from the United States in September of 1994.

have entered the United States. We now conclude that it does.

In *United States v. Salerno*, the Supreme Court explained that "the Due Process Clause protects individuals against two types of government action. So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience' or interferes with rights 'implicit in the concept of ordered liberty.' When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. This requirement has traditionally been referred to as 'procedural' due process." *United States v. Salerno*, 481 U.S. 739, 746 (1987) (citations omitted). The *Zadvydas* Court reiterated that "[f]reedom from imprisonment — from government custody, detention, or other forms of physical restraint — lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).

Therefore, government detention violates a person's substantive due process rights unless such detention is "ordered in a *criminal* proceeding with adequate procedural protections" or "in certain special and 'narrow' non-punitive 'circumstances,' where a special justification, such as harm-threatening mental illness, outweighs the 'individual's constitutionally protected interest in avoiding physical restraint.'" *Zadvydas*, 533 U.S. at 690 (citing *Salerno*, 481 U.S. at 739, and quoting *Foucha*, 504 U.S. at 80; *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997)) (emphasis in original). In *Zadvydas*, the Court determined that the detention of removable aliens by the INS is "civil, not criminal, and we assume that [it is] nonpunitive in purpose and effect." *Id*. The Court then looked to the regulatory goals of the statute to determine whether they constituted sufficient "special justification" to outweigh the aliens' interest in avoiding detention. According to the government's brief in *Zadvydas*, the regulatory goals of IIRIRA's post-removal-period detention provision are "'ensuring the appearance of aliens at

*must* implicate the Due Process Clause of the Fifth Amendment.[29]

### b. Indefinite Detention of Excludable Aliens under the Fifth Amendment

Although we believe that the Supreme Court's decision in *Zadvydas* fully supports our conclusion that the Due Process Clauses of the Fifth and Fourteenth Amendments apply to excludable aliens, we recognize that the *Zadvydas* Court left open the question whether the indefinite detention of excludable aliens raises the same constitutional concerns under those clauses as the indefinite detention of aliens who

---

[29] Although some other circuits have concluded that the detention of excludable aliens does not violate constitutional due process, no circuit has concluded that the Due Process Clauses of the Fifth and Fourteenth Amendments do not apply to excludable aliens. *See, e.g., Duy Dac Ho*, 204 F.3d at 1059 ("[W]hile aliens physically present in the United States are clearly 'persons' afforded some Fifth Amendment rights, they have no constitutional rights regarding their application for admission."); *Chi Thon Ngo*, 192 F.3d at 396 ("Even an excludable alien is a 'person' for purposes of the Fifth Amendment and is thus entitled to substantive due process."); *Zadvydas*, 185 F.3d at 289 ("The language of the due process clause refers to 'persons' not 'citizens,' and it is well established that aliens within the territory of the United States may invoke its provisions. . . . While the cases have drawn a line for some purposes between excludable aliens who failed to effect entry into the country unimpeded and resident aliens, in this Circuit it is clear that the former also can be considered persons entitled to protection under the 14th Amendment."); *Lynch*, 810 F.2d at 1374 ("[W]hatever due process rights excludable aliens may be denied by virtue of their status, they are entitled under the due process clauses of the fifth and fourteenth amendments to be free of gross physical abuse at the hands of state or federal officials."); *see also Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir. 1981) (construing the statute in effect at the time not to permit indefinite detention and stating that "it would appear that an excluded alien in physical custody within the United States may not be 'punished' without being accorded the substantive and procedural due process guarantees of the Fifth Amendment. Surely Congress could not order the killing of Rodriguez-Fernandez . . . .") (footnote omitted).

---

is appropriate for all aliens deported or excluded before April 1, 1997. We are persuaded for other reasons, however, that IIRIRA is the appropriate statute to assess in our review of the merits of Rosales's and Carballo's habeas petitions.

The government contends that IIRIRA does not apply to Rosales and Carballo because, pursuant to § 309(c), IIRIRA does not apply to aliens who were in exclusion or deportation proceedings prior to April 1, 1997. It is not clear from the government's brief whether it believes this interpretation to be of the statute's retroactivity (i.e., that IIRIRA does not apply retroactively to aliens ordered deported or excluded prior to its effective date) or of the statute's general applicability (i.e., that IIRIRA generally does not apply to aliens ordered deported or excluded prior to its effective date). To the extent that the argument is one of IIRIRA's retroactivity, we do not believe that retroactivity is at issue in these appeals. In *Alvarez-Mendez v. Stock*, the Ninth Circuit considered the legality of an excludable alien's detention under the statute in effect at the time of the decision. *Alvarez-Mendez v. Stock*, 941 F.2d 956, 960 (9th Cir. 1991), *cert. denied*, 506 U.S. 842 (1992). "Although the new section 1226(e) does not retroactively authorize any of the Attorney General's acts accomplished prior to the amendment, we are concerned here only with the legality of Alvarez-Mendez's *present detention*. Because this case involves a petition for the writ of habeas corpus, and not a claim for damages for illegal detention, *the only issue before us is whether Alvarez-Mendez's detention is illegal today*." *Id*. (emphasis added). We agree with this reasoning. Rosales and Carballo are not challenging the legality of their original detention — they are challenging the INS's authority to detain them now. Therefore, whether IIRIRA *retroactively* authorizes Rosales's

and Carballo's detention is irrelevant; we need only assess whether IIRIRA *currently* authorizes their detention.[20]

To the extent that the government's argument is one of IIRIRA's general applicability, the Supreme Court has stated that "[s]ection 309(c)(1) is best read as merely setting out the *procedural* rules to be applied to removal proceedings pending on the effective date of the statute." *St. Cyr*, 533 U.S. at 318 (emphasis in original). The *St. Cyr* Court also noted that "the Conference Report expressly explained, '[Section 309(c)] provides for the transition to new *procedures* in the case of an alien already in exclusion or deportation proceedings on the effective date.'" *Id*. (quoting H.R. Conf. Rep. No. 104-828, p.222 (1996)) (emphasis in original). In other words, according to the Supreme Court, § 309(c) provides only that IIRIRA does not apply to removal *proceedings* that were *pending* on April 1, 1997. *See also Zadvydas*, 185 F.3d at 286-87 & n.7 ("[T]he natural reading of the clause would thus seem to be that it applies only to proceedings that are pending as of the effective date."); *cf. Carrera-Valdez v. Perryman*, 211 F.3d 1046, 1048 (7th Cir. 2000) (applying pre-IIRIRA law to an alien "subject to an order of exclusion" on April 1, 1997); *Duy Dac Ho*, 204 F.3d at 1050 (same).[21]

---

[20]The Fifth Circuit has approached this question as one of retroactivity. *See Zadvydas*, 185 F.3d at 286 ("Zadvydas' detention could be covered by one of four separate detention regimes, depending on the degree of retroactivity involved."). Other circuits have noted in light of the Fifth Circuit's discussion in *Zadvydas* that there is a question as to which statute applies. *See Sierra v. INS*, 258 F.3d 1213, 1216 n.2 (10th Cir.), *cert. denied*, 122 S. Ct. 676 (2001); *Duy Dac Ho v. Greene*, 204 F.3d 1045, 1049-50, 1055 & n.8 (10th Cir. 2000); *Chi Thon Ngo*, 192 F.3d at 395.

[21]The Court in *St. Cyr* also noted that "[t]he INS' reliance . . . on *INS v. Aguierre-Aguierre*, 526 U.S. 415, 420 (1999), is beside the point because that decision simply observed that the new rules would not apply to a proceeding filed *before* IIRIRA's effective date." *St. Cyr*, 533 U.S. at 318 n.42 (emphasis in original). In *Aguierre-Aguierre*, the Court had

*Plasencia*, the Court explained that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly. Our cases have frequently suggested that a continuously present resident alien is entitled to a *fair hearing* when threatened with deportation." *Landon*, 459 U.S. at 32 (citations omitted) (emphasis added). And in *Mezei*, the Court held that:

> It is true that aliens who have once passed through our gates, even illegally, may be expelled only after *proceedings* conforming to traditional standards of fairness encompassed in due process of law. But an alien on the threshold of initial entry stands on a different footing: "Whatever the *procedure* authorized by Congress is, it is due process as far as an alien denied entry is concerned."

*Mezei*, 345 U.S. at 212 (citations omitted) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)) (emphasis added). The fact that excludable aliens are entitled to less process, however, does not mean that they are not at all protected by the Due Process Clauses of the Fifth and Fourteenth Amendments. If excludable aliens were not protected by even the substantive component of constitutional due process, as the government appears to argue, we do not see why the United States government could not torture or summarily execute them. Because we do not believe that our Constitution could permit persons living in the United States — whether they can be admitted for permanent residence or not — to be subjected to *any* government action without limit, we conclude that government treatment of excludable aliens

---

United States determines the aliens' rights with regard to immigration and deportation *proceedings*. It does not limit the right of excludable aliens detained within United States territory to humane treatment.") (emphasis added) (footnote omitted).

The fourteenth amendment to the constitution is not confined to the protection of citizens. It says: "Nor shall any state deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws.

*Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886). While we respect the historical tradition of the "entry fiction," we do not believe it applies to deprive aliens living in the United States of their status as "persons" for the purposes of constitutional due process. In fact, in *Mathews v. Diaz*, the Supreme Court held in regard to Cuban aliens who were in the United States on immigration parole pursuant to 8 U.S.C. § 1182(d)(5), that "[e]ven one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection [of the Due Process Clauses of the Fifth and Fourteenth Amendments]." *Mathews v. Diaz*, 426 U.S. 67, 75 n.7, 77 (1976); *see also Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term.").

As we understand the entry fiction, and the Supreme Court's discussion of it in *Zadvydas*, excludable aliens *are* treated differently for due process purposes than deportable aliens: they are entitled to less process.[28] In *Landon v.*

---

[28]Justice Scalia explained in his dissent in *Zadvydas* that the traditional distinction between excludable and deportable aliens developed "with regard to what *procedures* are necessary to prevent entry, as opposed to what *procedures* are necessary to eject a person already in the United States." *Zadvydas*, 533 U.S. at 704 (Scalia, J., dissenting) (emphasis in original); *see also Lynch v. Cannatella*, 810 F.2d 1363, 1373 (5th Cir. 1987) ("The 'entry fiction' that excludable aliens are to be treated as if detained at the border despite their physical presence in the

As neither Carballo's nor Rosales's exclusion proceeding was *pending* on April 1, 1997, and as neither petitioner is challenging his exclusion *proceeding*, we conclude that IIRIRA § 309(c) does not limit the applicability of IIRIRA to Rosales or Carballo.[22] IIRIRA governs the current detention of removed aliens beyond the removal period; therefore, we apply IIRIRA in assessing the legality of Rosales's and Carballo's current detention by the INS.

---

noted in regard to an alien deported prior to IIRIRA's effective date that "[t]he parties agree IIRIRA does not govern respondent's case," and it cited IIRIRA § 309(c). *Aguierre-Aguierre*, 526 U.S. at 420. We emphasize that *Aguierre-Aguierre* involved an alien's challenge to his deportation *proceeding. See id.* at 418.

[22]At oral argument, the government also argued that we should defer to its interpretation of IIRIRA § 309(c) pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At least one other circuit has invoked *Chevron* in the context of determining which statute to assess in an excluded or deported alien's petition for habeas relief from detention. *See Zadvydas*, 185 F.3d at 286-87. We, however, do not believe that *Chevron* applies in this context. First, the government has only advocated in litigation the application of pre-IIRIRA law to petitioners like Rosales and Carballo. An interpretation contained in a brief — like interpretations contained in opinion letters, policy statements, agency manuals, and enforcement guidelines — lacks the force of law and is therefore not entitled to *Chevron* deference. *See Christensen v. Harris County*, 529 U.S. 576, 586-87 (2000). Second, although the government's position is entitled to respect pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), we conclude that the government's position has been inconsistent and is therefore unpersuasive. *See Christensen*, 529 U.S. at 587.

In a number of other cases in which excluded, deported, or removed aliens challenged the legality of their continued detention, the government argued that IIRIRA should apply to alien petitioners who had been excluded or deported prior to April 1, 1997. *See, e.g., Sierra v. INS*, 258 F.3d 1213, 1216 n.2 (10th Cir.), *cert. denied*, 534 U.S. 1071 (2001); *Zadvydas*, 185 F.3d at 286. Inasmuch as shifting agency interpretations issued in *regulations* are accorded less deference under the highly deferential *Chevron* standard, *see INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987), we see no reason why we should respect shifting agency interpretations expressed in briefs.

## D. Statutory Authority to Detain Indefinitely

### 1. Statutory Construction in *Zadvydas*

Under IIRIRA, Rosales's and Carballo's detention by the INS is governed by 8 U.S.C. § 1231(a)(6) (2000), the post-removal-period detention provision. Normally, after a final order of removal has been entered against an alien, the government must remove the alien from the United States within a 90-day statutory removal period, during which the alien is held in custody. 8 U.S.C. §§ 1231(a)(1)(A) (2000) ("Except as otherwise provided in the section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days (in this section referred to as the 'removal period').") & (2) ("During the removal period, the Attorney General shall detain the alien."); *see also Zadvydas*, 533 U.S. at 682. 8 U.S.C. § 1231(a)(6) (2000) provides, however, that:

An alien ordered removed who is inadmissible under section 1182 of this title, removable under section 1227(a)(1)(C), 1227(a)(2), or 1227(a)(4) of this title or who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to the terms of supervision in paragraph (3).

the Constitution's demands, limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States. It does not permit indefinite detention." *Id*. at 689. "A statute permitting indefinite detention of an alien would raise a serious constitutional problem. The Fifth Amendment's Due Process Clause forbids the Government to depriv[e] any person . . . of liberty . . . without due process of law." *Id*. at 690. The Court concluded that while indefinite civil detention may be permissible in some few cases, an alien's status as removable is alone insufficient to outweigh his constitutionally protected liberty interest. *Id*. at 690-92.

Neither the Court's holding nor the Court's discussion of the due process problems with indefinite detention distinguish between excludable and other aliens. Following its conclusion that an alien's status as removable alone does not outweigh his constitutionally protected liberty interest, however, the Court noted: "The Government argues that, from a constitutional perspective, alien status itself can justify indefinite detention, and points to *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953), as support." *Id*. at 692. The Court explained that *Mezei* involved an excludable alien, and, as we describe above, it then distinguished *Mezei* from the cases before it by invoking the entry fiction. *Id*. at 693-94 ("Although *Mezei*, like the present cases, involves indefinite detention, it differs from the present cases in a critical respect. . . . His presence on Ellis Island did not count as entry into this country once again.").

The government first contends in these appeals that this portion of the Court's opinion in *Zadvydas* demonstrates that the detention of excludable aliens cannot raise constitutional concerns because such detention "does not *implicate* the Fifth Amendment." Gov't Supp. Br. re Rosales at 50 (emphasis added). We could not more vehemently disagree. Excludable aliens — like all aliens — are clearly protected by the Due Process Clauses of the Fifth and Fourteenth Amendments:

§ 1231(a)(6), as construed in *Zadvydas*, does not authorize the INS to detain Petitioner[, an excludable alien,] indefinitely.").[27] We thus agree with the petitioners that we should apply 8 U.S.C. § 1231(a)(6) (2000) to them with the reasonableness limitation that the Court read into that provision in *Zadvydas*. However, because it is not completely clear from the Court's opinion in *Zadvydas* how the Court intended its statutory construction to be applied, we also explain why constitutional concerns would independently compel us to construe IIRIRA's post-removal-period detention provision to contain a reasonableness limitation for excludable aliens.

**2.   Constitutional Concern Raised with Regard to Excludable Aliens**

**a.   Applicability of Fifth Amendment Due Process to Excludable Aliens**

Describing the doctrine of constitutional avoidance, the *Zadvydas* Court stated "when an Act of Congress raises 'a serious doubt' as to its constitutionality, 'this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Zadvydas*, 533 U.S. at 689 (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)). The Court then held that "the statute, read in light of

---

[27]Justice Kennedy also noted in his dissent that:
Accepting the majority's interpretation, then, there are two possibilities, neither of which is sustainable. On the one hand, it may be that the majority's rule applies to both categories of aliens, in which case we are asked to assume that Congress intended to restrict the discretion it could confer upon the Attorney General so that all inadmissible aliens must be allowed into our community within six months. On the other hand, the majority's logic might be that inadmissible and removable aliens can be treated differently. Yet it is not a plausible construction of § 1231(a)(6) to imply a time limit as to one class but not another. The text does not admit of this possibility.
*Zadvydas*, 533 U.S. at 710 (Kennedy, J., dissenting).

---

8 U.S.C. § 1231(a)(6) (2000).[23]  In *Zadvydas*, the Supreme Court addressed the detention of two aliens who had been removed on grounds of deportability.[24]  Concluding that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem," the *Zadvydas* Court read

---

[23]We note that IIRIRA's removal and detention provisions are substantially similar to the exclusion and detention provisions in pre-IIRIRA law.  8 U.S.C. § 1226(e) (1994) provided:
(1)  Pending a determination of excludability, the Attorney General shall take into custody any alien convicted of an aggravated felony upon release of the alien (regardless of whether or not such release is on parole, supervised release, or probation, and regardless of the possibility of rearrest or further confinement in respect of the same offense).
(2)  Notwithstanding any other provision of this section, the Attorney General shall not release such felon from custody unless the Attorney General determines that the alien may not be deported because the condition described in section 1253(g) (country of citizenship delays in the acceptance of deportees) of this title exists.
8 U.S.C. § 1226(e) (1994).  As the Third Circuit has noted, "[u]nder the IIRIRA, what was once implicit is now express — the Immigration Act now specifically provides that the Attorney General shall detain an 'inadmissible' alien for a 90-day period pending 'removal' from the country, and may continue to detain him until deportation if he has been found guilty of designated crimes."  *Chi Thon Ngo*, 192 F.3d at 394-95.

---

[24]8 U.S.C. § 1231(a)(6) (2000) applies to three groups of removable aliens: (1) aliens who are "inadmissible under section 1182" ("aliens who are removable on grounds of inadmissibility"); (2) aliens who are deportable under §§ 1227(a)(1)(C) (violation of nonimmigrant status or condition of entry), 1227(a)(2) (criminal offenses), and 1227(a)(4) (security and related grounds) ("aliens who are removable on grounds of deportability"); and (3) aliens who are "a risk to the community or unlikely to comply with the order of removal."
Under IIRIRA, Zadvydas and Kim Ho Ma, the two aliens at issue in *Zadvydas*, are removable on grounds of deportability pursuant to 8 U.S.C. § 1227(a)(2) (2000).  Pre-IIRIRA, Zadvydas was classifed as deportable, *see Zadvydas*, 533 U.S. at 684, and Kim Ho Ma would have been classified as deportable.  Rosales and Carballo, classified as excludable aliens under pre-IIRIRA law, are removable under IIRIRA on grounds of inadmissibility pursuant to 8 U.S.C. § 1182(a)(6) (2000).

the provision to limit "an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States." *Zadvydas*, 533 U.S. at 689. The Court then recognized six months as a presumptively reasonable period of post-removal-period detention. *Id*. at 699-702. Because we are assessing the same provision of IIRIRA that the Supreme Court considered in *Zadvydas*, the petitioners ask us simply to apply to them the reasonableness limitation the Supreme Court read into the provision in *Zadvydas*. The government contends, however, that the *Zadvydas* Court's construction of 8 U.S.C. § 1231(a)(6) (2000) does not apply to Rosales and Carballo because the detention of aliens who are removable on grounds of inadmissibility does not raise the same constitutional concerns as the detention of aliens who are removable on grounds of deportability.

On the basis of the plain language of the provision, we find it difficult to believe that the Supreme Court in *Zadvydas* could interpret § 1231(a)(6) as containing a reasonableness limitation for aliens who are removable on grounds of deportability but not for aliens who are removable on grounds of inadmissibility. Section 1231(a)(6) itself does not draw any distinction between the categories of removable aliens; nor would there be any statutory reason to interpret "detained beyond the removal period" differently for aliens who are removable on grounds of inadmissibility and aliens who are removable on grounds of deportability. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) (discussing presumption that a statutory term retains the same meaning throughout a statute and in particular throughout a provision). The Ninth Circuit recently addressed this issue, and it concluded that the Supreme Court's construction of § 1231(a)(6) in *Zadvydas* applied to an inadmissible, formerly excludable, alien. *See Lin Guo Xi v. INS*, 298 F.3d 832, 834 (9th Cir. 2002). ("We are now presented with the question of whether [8 U.S.C. § 1231(a)(6)] bears the same meaning for an individual deemed inadmissible to the United States under 8 U.S.C. § 1182. The answer is yes."). The court in *Lin Guo Xi*

We explained above that, on the basis of the plain language of the statute, we do not believe that the *Zadvydas* Court could construe the statute differently for aliens who are removable on grounds of inadmissibility and aliens who are removable on grounds of deportability. It is even less conceivable, therefore, that the Court construed the statute differently for excludable and deportable aliens. In enacting IIRIRA, Congress not only abolished the use of the term "excludable," but it also abolished that category of alien. "The INA is no longer denominated in terms of 'entry' and 'exclusion.' IIRIRA replaced these terms with the broader concept of 'admission.'" *Lin Guo Xi*, 298 F.3d at 838; *see also id*. ("We simply cannot ignore that 'excludable' is no longer a term that has any statutory import under the INA."). To accept the government's argument that the *Zadvydas* Court's construction of § 1231(a)(6) does not apply to Rosales and Carballo, therefore, we would have to conclude that the *Zadvydas* Court interpreted a statute currently in force to apply differently to a category of alien that no longer exists in immigration law. Without explicit instruction by the Court, we will not reach such a conclusion.

As the court in *Lin Guo Xi* concluded, "[t]he clear text of the statute, coupled with the Supreme Court's categorical interpretation, leaves us little choice but to conclude that *Zadvydas* applies to inadmissible individuals like Lin Guo Xi. The statute, on its face, makes no exceptions for inadmissible aliens. The Supreme Court's unqualified holding provides that the statute 'does not permit indefinite detention.'" *Lin Guo Xi*, 298 F.3d at 836 (quoting *Zadvydas*, 533 U.S. at 689); *see also Borrero v. Aljets*, 178 F.Supp.2d 1034, 1042 (D. Minn. 2001) ("[W]e can find no sound reason to interpret and apply the statute one way for one category of aliens, but a different way for others. We therefore must conclude that

deportability and for aliens who are removable on grounds of inadmissibility, excepting those formerly classified as excludable. 8 C.F.R. § 241.13 (2002).

that "Congress has preserved the right to habeas review for both criminal and non-criminal aliens." *Id.*

Finally, we note that *Zadvydas* Court did not actually distinguish between aliens who are removable on grounds of inadmissibility and aliens who are removable on grounds of deportability in its analysis of the constitutional concerns raised by the indefinite detention of aliens who are removable on grounds of deportability. The Court only refers to "admission" at the outset of the opinion; in its discussion of the constitutional concern raised by the statute, the Court distinguishes between aliens who have "entered" the United States and those who have not. *Zadvydas*, 533 U.S. at 682, 692. As we explained above, *see supra* note 1, "admission" is a defining principle in IIRIRA, whereas "entry" was a defining principle in pre-IIRIRA immigration law. In its briefs in the instant appeal, as in *Lin Guo Xi*, the government implies that "the central operating terms of the two statutes are functionally the same — namely . . . that 'entry' and 'admission' are interchangeable and that 'excludable' and 'inadmissible' are interchangeable." *Lin Guo Xi*, 298 F.3d at 838. As we also explained above in note 1, however, these terms are *not* interchangeable. *See also id.* Admission is defined as "the *lawful* entry of [an] alien into the United States," 8 U.S.C. § 1101(a)(13)(A) (2000) (emphasis added); aliens who enter this country illegally and who were formerly classified as "deportable" are now classified as "inadmissible." Therefore, to the extent that the *Zadvydas* Court distinguished between categories of aliens in its analysis of the constitutional concerns raised by the statute, it distinguished only between excludable and deportable aliens.[26]

---

[26]At least in its regulations, the INS appears to agree with this analysis. The government argues in the instant cases that the Supreme Court's statutory construction in *Zadvydas* should not apply to *any* inadmissible aliens. However, after the Court's opinion was issued in *Zadvydas*, the INS promulgated regulations limiting the post-removal-period detention both for aliens who are removable on grounds of

explained that "[s]ection 1231(a)(6) . . . does not draw any distinction between individuals who are removable on grounds of inadmissibility and those removable on grounds of deportability." *Id.* at 835.[25]

We also do not believe that the Supreme Court intended to construe § 1231(a)(6) differently for aliens who are removable on grounds of inadmissibility and aliens who are removable on grounds of deportability. The government focuses on the *Zadvydas* Court's statement at the outset of its opinion that "[w]e deal here with aliens who were admitted to the United States but subsequently ordered removed. Aliens who have not yet gained initial admission to this country would present a very different question." *Zadvydas*, 533 U.S. at 682. In addition, the government looks to the portion of *Zadvydas* in which the Court distinguished its decision in *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206 (1953). *See Zadvydas*, 533 U.S. at 693-95. The Court stated that "[a]lthough *Mezei*, like the present cases, involves indefinite detention, it differs from the present cases in a critical respect. . . . [Mezei's] presence on Ellis Island did not count as entry into the United States." *Id.* at 693. The Court then further explained:

> The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law. . . . It is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders. . . . [O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause

---

[25]The court in *Lin Guo Xi* also noted that "[t]he statute, on its face, makes no exceptions for inadmissible aliens. . . . It is a venerable principle of statutory interpretation 'that where the Legislature makes a plain provision, without making any exception, the courts can make none'." *Lin Guo Xi*, 298 F.3d at 836 (quoting *French's Lessee v. Spencer*, 62 U.S. (21 How.) 228, 238 (1858)).

applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent.

*Id*. According to the government, "[i]t is unreasonable to assume the *Zadvydas* Court went to such great lengths to distinguish the Government's authority to detain inadmissible aliens from its authority to detain aliens who have entered the country only to mandate that the courts treat both groups of aliens identically under § 1231(a)(6)." Gov't Supp. Br. re Rosales at 38-39.

We agree with the government that the *Zadvydas* Court addressed only the constitutional concerns raised by the indefinite detention of aliens who are removable on grounds of deportability, but we also agree with the Ninth Circuit in *Lin Guo Xi* that the Supreme Court's *holding* in *Zadvydas* was "unqualified." *Lin Guo Xi*, 298 F.3d at 836. "Although *Zadvydas* concerned the second prong of the statute — relating to deportable aliens — the Court's ultimate holding addresses the statute as a whole: 'we construe the statute to contain an implicit "reasonable time" limitation, the application of which is subject to federal court review.'" *Lin Guo Xi*, 298 F.3d at 835 (quoting *Zadvydas*, 533 U.S. at 682). The *Zadvydas* Court also noted that the statute "applies to certain categories of aliens who have been ordered removed, namely inadmissible aliens, criminal aliens, aliens who have violated their nonimmigrant status conditions, and aliens removable for certain national security or foreign relations reasons . . . ." *Zadvydas*, 533 U.S. at 688. Furthermore, in stating that the statute does not permit indefinite detention, the Court referred generally to aliens as opposed to aliens who are removable on grounds of deportability: "[i]n our view, the statute, read in light of the Constitution's demands, limits *an alien's* post-removal-period detention to a period reasonably necessary to bring about *that alien's* removal from the United States." *Id*. at 689 (emphasis added).

As in *Lin Guo Xi*, the government in the instant cases "has offered no authority suggesting that a litigant may not take advantage of a statutory interpretation that was guided by the principle of constitutional avoidance when that litigant's case does not present the constitutional problem that prompted the statutory interpretation." *Lin Guo Xi*, 298 F.3d at 839. In a case addressing a remarkably similar issue of statutory construction, the Third Circuit recently stated that "[i]t simply cannot be that the meaning will change depending on the background or pedigree of the petitioner. Were we to so hold, we would render the meaning of any statute as changeable as the currents of the sea, and potentially as cruel and capricious." *Chmakov v. Blackman*, 266 F.3d 210, 215 (3rd Cir. 2001). We fully agree with this reasoning.

In *Chmakov*, the court addressed the applicability of the Supreme Court's construction of certain provisions of IIRIRA and AEDPA to individuals who did not raise the same constitutional concerns as the individuals in the case in which the Court construed the statute. The Supreme Court in *St. Cyr* held that, notwithstanding certain provisions of IIRIRA and AEDPA, aliens who had been ordered deported on the basis of criminal convictions could petition the federal courts for habeas relief from their deportation decisions. *St. Cyr*, 533 U.S. at 298-314. The Court in *St. Cyr* interpreted IIRIRA and AEDPA not to preclude federal habeas jurisdiction both because such preclusion raised serious constitutional concerns under the Suspension Clause and because there was no clear and unambiguous statement of congressional intent to preclude habeas. In *Chmakov*, the government argued that although the *St. Cyr* Court had interpreted IIRIRA and AEDPA not to repeal federal habeas jurisdiction over *criminal* deportees, the Court's interpretation of those statutes did not apply to the Chmakovs because, as *non-criminal* deportees, the Suspension Clause could not be a cause for constitutional concern. *Chmakov*, 266 F.3d at 215. The Third Circuit responded to this argument by first stating that "[t]hat argument borders on the nonsensical," and the court then held